IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:21-cv-00171-RJC-WCM

| | |
|---|---|
| ELECTROLYSIS PREVENTION SOLUTIONS LLC, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| DAIMLER TRUCK NORTH AMERICA LLC, | ) ) ) ) |
| Defendant. | ) ) |

ORDER

This matter is before the Court on Plaintiff's "Motion to Strike and Exclude Expert Opinions Regarding Alleged Noninfringing Alternatives as Untimely and Pursuant to <u>Daubert</u>" (the "Motion to Strike," Doc. 159) and Defendant's "Motion to Exclude Certain Opinions of Mr. Stephen Holzen" (the "Motion to Exclude," Doc. 164), which have been referred to the undersigned.

I. Relevant Background

Electrolysis Prevention Solutions, LLC ("EPS") asserts that Daimler Trucks North America LLC ("DTNA")[1] has infringed U.S. Patent No. RE47,494 (the "'494 Patent"), which relates "generally to improved radiators with an

---

[1] In October of 2022, the docket was amended to reflect that DTNA's name had been changed to "Daimler Truck North America LLC." <u>See</u> Docs. 65, 67, and text-only order entered on October 26, 2022.

electrolysis prevention device in the form of a sacrificial anode,"[2] by "making, using, offering for sale, selling and/or importing radiators" that infringe on one or more claims of the '494 Patent. Doc. 1 at 4.

After various extensions, the following pertinent pretrial deadlines were set:

| Date | Deadline |
|---|---|
| 3/17/2023 | Close of Fact Discovery.[3] |
| 4/28/2023 | Opening Expert Reports. |
| 6/8/2023 | Rebuttal Expert Reports. |
| 8/18/2023 | Close of Expert Discovery. |
| 8/18/2023 | Dispositive motion deadline and Daubert motion deadline. |

On August 18, 2023, the Motion to Strike and Motion to Exclude were filed. Docs. 159, 164.

On October 27, 2023, the remaining pretrial deadlines were stayed and the January 2, 2024 trial setting was canceled, to be reset at a later time. Doc. 225.

## II. Legal Standards

### A. Timeliness of Disclosures

Rule 37(c)(1) states that "[a] party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a

---

[2] The parties have used various terms such as "tube stiffener," "tube insert," and "tube reinforcement insert" to describe the sacrificial anode.

[3] Though not germane here, a carve out with respect to this deadline was later allowed with respect to fact discovery regarding certain topics. See Doc. 146.

2

prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial ... any witness or information not so disclosed." That is, the rule "provides a self-executing sanction where 'a party fails to provide information or identify a witness as required by Rule 26(a) or (e).'" Goodwin v. Cockrell, No. 4:13–CV–199–F, 2015 WL 575861 (E.D.N.C. Feb. 11, 2015) (quoting Fed.R.Civ.P. 37(c)(1)). "The determination of whether a Rule 26(a) or (e) violation is justified or harmless is entrusted to the broad discretion of the district court." Reed v. Washington Area Metro. Transit Auth., No. 1:14CV65, 2014 WL 2967920, at *2 (E.D.Va. July 1, 2014).

In making such a determination, courts in the Fourth Circuit consider the following factors:

> (1) the surprise to the party against whom the witness was to have testified; (2) the ability of the party to cure that surprise; (3) the extent to which allowing the testimony would disrupt the trial; (4) the explanation for the party's failure to name the witness before trial; and (5) the importance of the testimony.
>
> Southern States Rack and Fixture Inc. v. Sherwin-Williams Co., 318 F.3d 592, 596 (4th Cir. 2003) (quoting Rambus, Inc. v. Infineon Technologies AG, 145 F.Supp.2d 721, 726 (E.D.Va.2001)).

### B. Relevance and Reliability of Expert Testimony

Rule 702 of the Federal Rules of Evidence states that:

A witness who is qualified as an expert by knowledge,

> skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

To be admissible, expert testimony must be both relevant and reliable. See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). Where a party seeks to exclude expert testimony as unreliable, the following factors may be considered:

> (1) whether a theory or technique can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) whether a technique has a high known or potential rate of error and whether there are standards controlling its operation; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community.
>
> Hickerson v. Yamaha Motor Corp., 882 F.3d 476, 480-481 (4th Cir. 2018) (quoting Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199 (4th Cir. 2001) (citing Daubert, 509 U.S. at 592–94)).

The Fourth Circuit has further explained that the "Rule 702 inquiry is 'a flexible one,' and the *Daubert* factors are 'helpful, not definitive.' When applying these standards, courts 'should be conscious of two guiding, and

4

sometimes competing, principles[:] Rule 702 was intended to liberalize the introduction of relevant expert evidence [and] expert witnesses have the potential to be both powerful and quite misleading.'" Hickerson, 882 F.3d at 481 (citations omitted). One district court has noted that "post-Daubert decisions have shown 'that the rejection of expert testimony is the exception rather than the rule.' 'Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof' remain 'traditional and appropriate means' of attacking expert testimony that has been admitted by the trial judge." Herrera v. Sherrill, Inc., No. TDC-16-1753, 2023 WL 2245250, at *3 (D. Md. Feb. 27, 2023) (quoting Fed R. Evid. 702 advisory committee's note to 2000 amendment; Daubert, 509 U.S. at 596).

### III. Discussion

#### A. The Motion to Strike (Doc. 159)

EPS contends that any opinions by DTNA's experts, Dr. Wendy Sanders and Dr. Keith Ugone, regarding the existence of non-infringing alternatives ("NIAs") should be excluded because they were untimely disclosed and/or are unreliable.

#### 1. The Timeliness of DTNA's Disclosures

EPS asserts that on August 2, 2021, it requested, by written interrogatory, that DTNA identify all alleged NIAs. See Doc. 161 at 8.

In its First Supplemental Response, which was apparently served on

5

February 3, 2023, DTNA stated that there were "many non-infringing ways to accomplish the goals of the tube stiffeners. For example, radiators can be made with metals that will resist thermal stress, or with sufficient thickness in the tubes to resist thermal stress." Doc. 161-2 at 36; Doc. 182 at 6.

On March 6, 2023, DTNA submitted a Second Supplemental Response, which stated:

> Radiators sold by Titan X to DTNA and installed on DTNA vehicles are noninfringing alternatives to the asserted claims. As Titan X has confirmed, the radiators it has sold to DTNA do not include "tube tabs" or "tube stiffeners"—the structures EPS has alleged meet the "sacrificial anode" limitations of the asserted claims. Moreover, EPS has dropped its allegations of infringement with respect to these products. Accordingly, as DTNA purchased and installed these radiators during the period of alleged infringement, each is technically feasible and acceptable to DTNA's customers. Indeed, Titan X is the primary supplier of radiators to DTNA for its production vehicles.
>
> Similarly, radiators sold by Modine to DTNA and installed on DTNA vehicles are noninfringing alternatives to the asserted claims. Modine has similarly confirmed that its radiators do not include "tube tabs" or "tube stiffeners," and EPS has similarly dropped its claims that any Modine radiators infringe. These products were bought by DTNA and installed on vehicles during the period of alleged infringement. Thus, they too are non-infringing alternatives.
>
> Moreover, radiators sold by Mahle that do not include "tube tabs" or "tube stiffeners" are non-infringing alternatives to the asserted claims. These radiators include, for example, radiators listed in the Bill of

> Materials provided by Mahle for each of the radiators sold to DTNA (MBC-0000240) which do not list "Support-Pipe." Exemplar radiators include: Radiator Model No. 74676; Radiator Model No. B9424; Radiator Model No. X4523001; Radiator Model No. E0400; Radiator Model No. E0399; Radiator Model No. D5293; Radiator Model No. C3162; Radiator Model No. B9706; Radiator Model No. B9703; Radiator Model No. B7597; Radiator Model No. B7594; Radiator Model No. 91662; Radiator Model No. 75084; Radiator Model No. 74668; Radiator Model No. 91666; Radiator Model No. B2111; Radiator Model No. B8530; and Radiator Model No. E0401. Each of these radiators were sold and/or installed—proving the viable and acceptable non-infringing alternatives.

Doc. 161-2 at 37-38.

On April 28, 2023, DTNA timely served an opening report from its technical expert, Dr. Sanders. EPS asserts that this report did not include any opinions regarding NIAs. Doc. 161 at 8.

Also on April 28, 2023, EPS timely served opening reports from its technical expert, Michael Nranian, and its damages expert, Stephen Holzen. Both of these opening reports addressed the alleged NIAs in DTNA's First and Second Supplemental Responses. See Doc. 182-1 at ¶¶ 161-167; Doc. 182-2 at ¶¶ 80-82.

On June 8, 2023, DTNA timely served rebuttal reports by Dr. Sanders and Dr. Ugone.

In her rebuttal report, Dr. Sanders identified the following NIAs: (1) certain radiators made and sold to DTNA by TitanX, Modine, or Mahle Behr

7

(the "Described Radiators"); (2) "radiators with the alleged sacrificial anode eleven inches from the inlet" (Doc. 161-3 at ¶¶ 252-255); and (3) "radiators with metals that will resist thermal stress, or with sufficient tube thickness to resist thermal stress, such that tube reinforcement inserts are unnecessary." Doc. 161-3 at ¶ 256.

In his rebuttal report, Dr. Ugone stated that "[a]ccording to Dr. Sanders, [DTNA] would have had available numerous non-infringing alternatives" including "chemical corrosion inhibitors," "sacrificial anodes placed in radiator caps," and "proper electrical grounding" and additionally noted that DTNA purchased most of its radiators "from non-accused manufacturers." Doc. 161-4 at ¶ 103(e) & Table 16.

On June 16, 2023, EPS took the deposition of Dr. Ugone. EPS did not depose Dr. Sanders. See Doc. 182 at 12; Doc. 183-8.

For the reasons set out below, the undersigned is not persuaded that Dr. Sanders' or Dr. Ugone's opinions regarding alleged NIAs should be excluded as untimely.

DTNA's delay in providing detailed information regarding potential NIAs is problematic; the Second Supplemental Response was served less than 2 weeks prior to the close of the fact discovery period and in response to an interrogatory that had been propounded more than a year and a half earlier. However, EPS did not move to extend the discovery deadline to conduct

8

additional discovery regarding the Described Radiators or any other alleged NIAs referenced in the First or Second Supplemental Responses, nor move to compel a more specific answer regarding the alleged NIAs.

Further, considering DTNA's responses regarding NIAs as set out in the First and Second Supplemental Responses and Mr. Nranian's and Mr. Holzen's opening reports addressing the alleged NIAs, the undersigned is not persuaded that it was improper for Dr. Sanders and Dr. Ugone to include opinions regarding NIAs in their rebuttal reports. See Geigtech East Bay LLC v. Lutron Electronics Co., Inc., Nos. 18 Civ. 05290 (CM), 19 Civ. 04693 (CM), 20 Civ. 10195 (CM), 2023 WL 6614486 at *4 (S.D.N.Y. Sept. 20, 2023) ("[Defendant] was under no obligation to provide expert opinions about non-infringing alternatives prior to filing rebuttal reports. It is [plaintiff's] burden to prove damages, including reasonable royalties") (citing ResQNet.com, Inc. v. Lansa, Inc., 594 F.3d 860, 872 (Fed. Cir. 2010)); Precision Fabrics Group, Inc. v. Tietex International, Ltd., 297 F. Supp. 3d 547, 555-561, 99 Fed. R. Serv. 3d 1781 (D.S.C. 2018), subsequent determination, 2018 WL 6680931 (D.S.C. 2018) (granting motion in limine in part but allowing accused infringer to introduce evidence of non-infringing alternatives that were expressly discussed in its damages expert's report).

Relatedly, Dr. Sanders' opinion regarding NIAs was timely disclosed on June 8, 2023, and the deadline to complete expert discovery was extended

9

Case 3:21-cv-00171-RJC-WCM   Document 235   Filed 02/20/24   Page 9 of 20

through August 18, 2023, but EPS did not take the deposition of Dr. Sanders. Cf. SPEX Techs. V. Apricorn, Inc., No. CV 16-07349JVS(AGRx), 2020 WL 1289546 at *3 (C.D. Cal. Jan. 21, 2020) (excluding expert testimony on NIAs where defendant failed to disclose the existence of NIAs until after the close of discovery and only ten days before the deadline for expert reports); Smart Skins LLC v. Microsoft Corporation, No. C15-544-MJP, 2016 WL 4148091, at *2 (W.D. Wash. July 1, 2016) (striking opinions of defendant's experts that relied upon alleged NIAs where defendant failed to disclose any NIAs in response to discovery requests or during its corporate deposition and asserted NIAs for the first time in rebuttal reports).

## 2. The Reliability of the Experts' Opinions

EPS argues that, except for the Mahle Behr radiators listed as exemplars, DTNA has failed to identify any of the alleged NIAs with specificity, and, relatedly, has failed to meet its burden of establishing that the alleged NIAs are non-infringing and acceptable alternatives to the asserted device. See Doc. 161 at 16.

### a. Specificity

DTNA contends that EPS knows what specific radiators are alleged to be NIAs because they are the same radiators EPS originally accused of infringement.

To the extent EPS moves to exclude expert testimony regarding the

10

Described Radiators as insufficiently identified, the undersigned is persuaded by DTNA's arguments.

However, to the extent DTNA relies on Dr. Sanders' references to "radiators with the alleged sacrificial anode eleven inches from the inlet" or "radiators with metals that will resist thermal stress, or with sufficient tube thickness to resist thermal stress, such that tube reinforcement inserts are unnecessary," these descriptions are too generic to adequately disclose DTNA's position. See Droplets, Inc. v. Yahoo! Inc., No. 12-cv-03733-JST, 2021 WL 9038509, at *9 (N.D. Cal. April 27, 2021) (finding generic interrogatory responses did not adequately disclose defendant's position regarding NIAs and striking opinions of expert when trial was less than two months away).

### b. Non-Infringing and Acceptable Alternatives

Finally, EPS argues that Dr. Sanders' opinions regarding the Described Radiators as NIAs should be excluded because DTNA has not met its burden of establishing that the Described Radiators are non-infringing and were available and acceptable to DTNA's customers during the damages period. See Doc. 191 at 4; see also WhereverTV, Inc. v. Comcast Cable Communications, No. 2:18-cv-529-JLB-NPM, 2022 WL 2751752 at *7 (M.D. Fla. July 14, 2022) ("Not only must the proposed alternatives be specifically noted, but their availability and acceptability must also be substantiated with record evidence"); Longhorn HD LLC v. Netscout Systems, Inc., No. 2:20-CV-00349-

11

JRG-RSP, 2022 WL 991696 at *4 (E.D. Tex. March 31, 2022) ("A reliable opinion on whether a product is or is not a non-infringing alternative is incomplete without opining whether the product is both 'available' and 'acceptable' (or whether there are not any 'available' or 'acceptable' alternatives))."

Here, although Dr. Sanders' opinions regarding the Described Radiators as NIAs could be more robust, the undersigned is not persuaded that, under the particular circumstances of this case, these opinions must be excluded.

Dr. Sanders explained the basis upon which she believed the Described Radiators were non-infringing. Dr. Sanders noted that the Described Radiators do not contain the "accused structures" and that, although EPS previously alleged that the Described Radiators were infringing, EPS subsequently dropped those allegations. See Doc. 161-3 at ¶¶ 243-246 ("based on the fact that the TitanX radiators do not contain the accused structures, they do not infringe the '494 patent. Certainly, EPS's decision to withdraw its allegations of infringement, despite having the opportunity to investigate these radiators, is also informative"); ¶ 247 (regarding Modine radiators); ¶ 250-251 (regarding Mahle Behr radiators).

Additionally, Dr. Sanders stated that the Described Radiators "were available" throughout the damages period because they were sold during the damages period and noted her understanding that TitanX was the "largest

12

supplier of radiators" to DTNA. Doc. 161-3 at ¶ 248 (citation to document production and deposition testimony omitted), ¶ 251. DTNA does not appear to be attempting to rely on theoretical alternatives to the asserted patent. See Grain Processing Corporation v. American Maize-Products Company, 185 F.3d 1341, 1353 (Fed. Cir. 1999) ("the trial court must proceed with caution in assessing proof of the availability of substitutes not actually sold during the period of infringement. Acceptable substitutes that the infringer proves were available during the accounting period can preclude or limit lost profits; substitutes only theoretically possible will not").

Accordingly, the motion will be denied as to Dr. Sanders' opinions regarding the Described Radiators as NIAs. See Droplets, Inc. v. Yahoo! Inc., No. 12-cv-03733-JST, 2021 WL 9038509, at *10 (N.D. Cal. April 27, 2021) ("both parties may rely on a variety of factors to prove the reasonableness or unreasonableness of a royalty rate") (internal citation omitted); see also i4i Ltd. P'ship v. Microsoft Corp., 598 F.3d 831, 856 (Fed. Cir. 2010) ("[Q]uestions about what facts are most relevant or reliable to calculating a reasonable royalty are for the jury"); Geigtech East Bay LLC v. Lutron Electronics Co., Inc., Nos. 18 Civ. 05290 (CM), 19 Civ. 04693 (CM), 20 Civ. 10195 (CM), 2023 WL 6614486 at *7 (S.D.N.Y. Sept. 20, 2023) ("To the extent GeigTech takes issue with the evidence that underlies Meyer's conclusions, it should vigorously cross-examine her.").

### B. The Motion to Exclude (Doc. 164)

DTNA argues that the opinions of EPS's damages expert, Mr. Holzen, regarding a reasonable royalty rate should be excluded as unreliable.

In his April 28, 2023 report, Mr. Holzen, concluded that a reasonable royalty rate of $75.00 per unit of the allegedly infringing radiators was appropriate. See Doc. 173-1. In reaching that conclusion, Mr. Holzen considered, among other things, the "2019 retail value" of "Corrosion Guard," which he characterized as an "aftermarket automotive product" that served as an "alternative solution for reducing the impact of electrolytic corrosion." Doc. 173-1 at ¶¶ 82-84. Additionally, Mr. Holzen considered the corrosion reduction rate allegedly realized by the use of the sacrificial anode – as determined by another of EPS's experts, Dr. David Rockstraw – and monetized that corrosion reduction rate as an expected value (i.e., an increase in the selling price of a radiator manufactured to include a sacrificial anode).

By its Motion, DTNA moves to preclude Mr. Holzen from "(1) using his inflated '2019 retail value of the Corrosion Guard' or any other inflated value for the Corrosion Guard in any calculation or opinion that he presents to the jury; and (2) offering any opinions to the jury based on the test data described in Dr. Rockstraw's expert report or Dr. Rockstraw's extrapolations from that data." Doc. 164 at 1.

### 1. Value of the Corrosion Guard

Mr. Holzen determined that "Corrosion Guard," a known prior art product, had a present retail value of $209.00 which resulted in an "upward impact" on a hypothetical negotiated royalty. Doc. 173-1 at ¶ 83. Mr. Holzen explained that:

> Between 2004 and 2007, JTM Enterprises ("JTM") sold Corrosion Guard to auto parts shops, repair shops and auto dealers for a price of approximately $89 per unit. My research indicates that average inflation ranged from 1.6% and 3.7% per year from 2006 and 2019. Therefore, the value of the Corrosion Guard, when expressed in 2019 dollars, using the CPI inflator index, is $110.07 per unit. I also note that the value of Corrosion Guard reflects a wholesale value – which means that a consumer would purchase the Corrosion Guard from a third party and pay for the product to be installed. Therefore, I calculate the 2019 retail value of Corrosion Guard ($209.30) by adjusting the 2019 wholesale value of ($110.07) consistent with Daimler's own 90.16% mark-up percentage. This markup percentage is consistent with my research which indicates that automotive businesses use a 100% markup on parts. The retail value of $209 is an economic indicator as to the value gained by a user from the use of a single-purpose product that provides a comparable benefit of reducing the effect of electrolytic corrosion.

Doc. 173-1 at ¶ 83 (footnotes omitted).

DTNA contends that Mr. Holzen's methodology, which valued the Corrosion Guard as a comparable product, is flawed.

With respect to whether the Corrosion Guard can be considered a valid

comparison product, DTNA asserts that only 51 units of the Corrosion Guard were sold by JTM during a four-year period from 2004 through 2007, and that it is inappropriate to compare the price "of such a thinly sold product" to the price of the accused radiators (of which tens of thousands are sold each year). Additionally, DTNA asserts that the cost of the allegedly infringing radiator component (the tube stiffener) is $3.88, such that comparing the cost of a tube stiffener to the cost of the Corrosion Guard is inappropriate.

With respect to Mr. Holzen's valuation of the Corrosion Guard itself, DTNA contends that Mr. Holzen's wholesale price of $110.07 per unit is inflated because (1) the Corrosion Guard was sold by JTM at an average sales price of $86.76 (not $89.00), (2) there is no indication that the Corrosion Guard would have increased in price due to "average inflation,"[4] and (3) between 2012 and 2021, retail offers for the sale of the Corrosion Guard on eBay "showed a consistent asking price" of $95.00. For any markup for purposes of retail price, DTNA argues that it does not sell the accused radiators at retail, and that JTM sold the Corrosion Guard to both retail and wholesale customers at the same price. Doc. 169-9 at 8.

The Federal Circuit has "recognized that questions regarding which facts

---

[4] DTNA argues that vehicles, phones, and computers are examples of products that become outdated (and therefore do not increase in price according to an average inflation rate), and that JTM's discontinuation of sales of the Corrosion Guard is evidence that the Corrosion Guard itself has become outdated.

are most relevant or reliable to calculating a reasonable royalty are 'for the jury.'" Apple Inc. v. Motorola, Inc., 757 F.3d 1286, 1315 (Fed. Cir. 2014), overruled en banc in part not relevant here, Williamson v. Citrix Online, LLC, 792 F.3d 1339, 1349 (Fed.Cir. 2015) (quoting i4i Ltd. P'ship v. Microsoft Corp., 598 F.3d 831, 856 (Fed. Cir. 2010)). Further, "estimating a 'reasonable royalty' is not an exact science. As such, the record may support a range of 'reasonable' royalties, rather than a single value. Likewise, there may be more than one reliable method for estimating a reasonable royalty." Id.

Here, the undersigned is persuaded that DTNA's challenges to Mr. Holzen's use and valuation of the Corrosion Guard as an alternative product in his reasonable royalty analysis are more appropriately addressed through cross examination rather than by exclusion. See e.g., ActiveVideo Networks, Inc. v. Verizon Communications, Inc., 694 F.3d 1312, 1333 (Fed. Cir. 2012) ("The degree of comparability of the Gemstar and Grande license agreements as well as any failure on the part of ActiveVideo's expert to control for certain variables are factual issues best addressed by cross examination and not by exclusion.").

### 2. Corrosion Reduction Rates

In his report, Mr. Holzen also opined that:

> According to Dr. Rockstraw, the sacrificial anode from Spectra reduces the rate of corrosion between 24.4% and 25.1%. Dr. Rockstraw also notes that the reduced

17

Case 3:21-cv-00171-RJC-WCM   Document 235   Filed 02/20/24   Page 17 of 20

> rate of corrosion increases the longevity of the radiator. I therefore impute the expected value of a radiator ($468 to $471) such that it would leave a customer indifferent as to whether they would purchase a radiator with or without the sacrificial anode by increasing the average selling price of the [lowest priced radiator sold by DTNA] ($376 per unit) by 24.4% and 25.1%, respectively.

Doc. 173-1 at ¶ 113.

DTNA argues that this opinion should be excluded because Dr. Rockstraw's testing was flawed. See Doc. 169-9 at 9. To the extent DTNA's position is based on the arguments set forth in DTNA's separate Motion to Exclude Testimony and Evidence about Resistivity and Benchtop Testing (Doc. 163), that Motion has been denied. Doc. 230.

DTNA also argues, though, that Mr. Holzen's opinion that customers would accept a price increase of approximately 24-25% based on the alleged increased longevity of a radiator manufactured with a sacrificial anode has no evidentiary support. The undersigned agrees that this opinion should be excluded. While Dr. Rockstraw opined that the presence of a sacrificial anode reduced the rate of corrosion by between 24.4% and 25.1%, and that "these percentages also relate to an equivalent extension of radiator life," Doc. 176-2 at 30 (sealed), Mr. Holzen has not adequately explain the basis for his conclusion that an alleged increase of a radiator's life would result in a corresponding price increase of the same percentage that would be accepted by

customers. See General Electric Company v. Joiner, 522 U.S. 136, 146 (1997) ("Trained experts commonly extrapolate from existing data. But nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

**IT IS THEREFORE ORDERED THAT**:

1. EPS's "Motion to Strike and Exclude Expert Opinions Regarding Alleged Noninfringing Alternatives as Untimely and Pursuant to Daubert" (Doc. 159) is **GRANTED IN PART**, and expert testimony based on NIAs described by Dr. Sanders as "radiators with the alleged sacrificial anode eleven inches from the inlet" or "radiators with metals that will resist thermal stress, or with sufficient tube thickness to resist thermal stress, such that tube reinforcement inserts are unnecessary" is **EXCLUDED**. In all other respects, the Motion is **DENIED**.

2. DTNA's Motion to Exclude Certain Opinions of Mr. Stephen Holzen (Doc. 164) is **GRANTED IN PART**, and expert testimony as to reasonable royalty rates based on Mr. Holzen's opinion that the inclusion of a

sacrificial anode would have increased the average selling price of the accused radiators by 24.4% to 25.1% is **EXCLUDED**. In all other respects, the Motion is **DENIED**.

Signed February 20, 2024

W. Carleton Metcalf
United States Magistrate Judge