**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**3:21-cv-00171-RJC-WCM**

| | | |
|---|---|---|
| **ELECTROLYSIS PREVENTION SOLLUTIONS LLC,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **ORDER** |
| **DAIMLER TRUCK NORTH AMERICA LLC,** | ) ) ) | |
| **Defendant.** | ) ) | |

**THIS MATTER** is before the Court on Defendant's Omnibus Motion for Summary Judgment seeking judgment on noninfringement, priority date, and pre-suit damages, (Doc. No. 162), and Plaintiff's Motion for Partial Summary Judgment of Validity, (Doc. No. 165).

## I.    BACKGROUND

Plaintiff Electrolysis Prevention Solutions LLC ("EPS" or "Plaintiff") alleges that Defendant Daimler Trucks North America LLC ("DTNA" or "Defendant") infringes claims 25–27, 29, 31–37, 42, and 45–47 ("Asserted Claims") of U.S. Reissue Patent No. RE47,494 ("the '494 patent"). (Doc. No. 120-5). There are two independent Asserted Claims: claims 25 and 37. The '494 patent is a reissue of U.S. Patent No. 8,236,145 ("the '145 patent"). This means the '494 patent has been examined by the United States Patent and Trademark Office ("PTO") twice. The '494 patent claims priority back to December 5, 2008, the filing date of U.S. Provisional Application No. 61/120,296.

1

Plaintiff commenced this action by filing its complaint on April 19, 2021. (Doc. No. 1). On April 12, 2022, a Markman Hearing was held before the Court. Subsequently, the Court entered a Markman order on May 4, 2022, construing the disputed claims in the patent-in-suit. (Doc. No. 41).

"The patent is directed to a solution for preventing corrosion in the cooling systems of motor vehicles caused by electrolysis." (*Id.* at 2). "The '494 patent proposes a solution to the shortcomings in the prior art by locating a sacrificial anode near the inlet (within 10 inches of the inlet, as claimed)[.]" (*Id.* at 3).

On August 18, 2023, Defendant DTNA filed its Motion for Summary Judgment. (Doc. No. 162). Plaintiff EPS filed its Motion for Partial Summary Judgment on the same day. The motions were fully briefed, and a hearing was held on October 24, 2023. These motions are ripe for review.

## II.    STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. *Id.* The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes

demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal citations omitted). "The burden on the moving party may be discharged by 'showing' . . . an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. *Id.* at 324. Instead, "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Sylvia Dev. Corp. v. Calvert Cty., Md.*, 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (citations omitted). The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. *Anderson*, 477 U.S. at 248.

3

### III. DEFENDANT'S OMNIBUS MOTION FOR SUMMARY JUDGMENT

Defendant DTNA argues that this Court should grant summary judgment that the products accused of infringing the patent-in-suit do not infringe as a matter of law, that Plaintiff EPS is not entitled to a priority date of July/August 2007, and that Plaintiff EPS is not entitled to damages arising prior to the filing of the present suit due to a failure to mark practicing anodes. (Doc. No. 169 at 8).

#### A. Defendant DTNA is not entitled to summary judgment as to noninfringement.

DTNA contends that this Court should grant summary judgment of non-infringement as to all asserted claims because Plaintiff EPS has failed to adduce any admissible evidence that the accused products include the required sacrificial anode. (Doc. No. 169, Def. Br., at 13). EPS argues that that Defendant asks the Court to ignore key evidence. (Doc. No. 177, Pl. Br., at 17–18).

Among its arguments regarding infringement, DTNA consistently urges the Court to conclude that EPS has pursued shifting theories of infringement which have changed over time. (Doc. No. 169 at 13–19; Doc. No. 193 at 10–11,16). Plaintiff contends that it has not shifted its theory of infringement in the case, and the Magistrate Judge agreed. (Doc. No. 177, Pl. Br., at 21).

Here, the Magistrate Judge addressed the "shifting theories" contentions in a prior order. (Doc. No. 170). The Magistrate Judge recognized a distinction between a new theory of infringement and additional evidence of infringement. (*Id.* at 2); *KlausTech, Inc. v. Google LLC*, No. 10CV05899JSWDMR, 2018 WL 5109383, at *3

4

(N.D. Cal. Sept. 14, 2018), *subsequently aff'd,* 792 F. App'x 954 (Fed. Cir. 2020). This Court agrees that EPS has not shifted its infringement theory through its deployment of "benchtop" and "resistivity" testing. Instead, EPS has identified evidence to support its infringement contentions.

"The law is clear that literal infringement requires that each and every limitation set forth in the claim must be present in the accused device." *Key Mfg. Grp., Inc. v. Microdot, Inc.*, 854 F.2d 1328 (Fed. Cir. 1988) (finding error where the district court determined certain claim limitations were "insignificant" and explaining that "[a]ll claim limitations are significant and must be considered. This error requires a remand unless the district court properly found infringement under the doctrine of equivalents." (citing *Under Sea Indus., Inc. v. Dacor Corp.,* 833 F.2d 1551, 1557, 4 USPQ2d 1772, 1776)) (citing 4 D. Chisum, *Patents* § 18.03[4] (1987)). "In analyzing infringement under the doctrine, claim limitations cannot be ignored, and 'the plaintiff must show the presence of every element or its substantial equivalent in the accused device.'" *Id.* (citing *Lemelson v. United States,* 752 F.2d 1538, 1551, 224 USPQ 526, 533 (Fed.Cir.1985)).

"A determination of infringement generally requires a two-step analysis—the court first determines the scope and meaning of the claims asserted, and then the properly construed claims are compared to the allegedly infringing device." *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1350 (Fed. Cir. 2022) (citing *CommScope Techs. LLC v. Dali Wireless Inc.*, 10 F.4th 1289, 1295 (Fed. Cir. 2021)). "The first step—claim construction—is a question of law[.] Whether an allegedly

infringing act includes all the steps of the properly construed claim is a question of fact." *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1351 (Fed. Cir. 2022) (first citing *Data Engine Techs. LLC v. Google LLC*, 10 F.4th 1375, 1380 (Fed. Cir. 2021); then citing *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331 (2015); and then citing *SmithKline Diagnostics, Inc. v. Helena Lab'ys Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988)).

"Summary judgment of noninfringement is appropriate where the patent owner's proof is deficient in meeting an essential part of the legal standard for infringement, since such failure will render all other facts immaterial." *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1323 (Fed. Cir. 2001) (citing *London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1537, 20 USPQ2d 1456, 1458 (Fed.Cir.1991)). Further, "patent infringement is a strict liability offense." *In re Seagate Tech., LLC*, 497 F.3d 1360, 1368 (Fed. Cir. 2007), *abrogated on other grounds by Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 136 S. Ct. 1923, 195 L. Ed. 2d 278 (2016). Thus, intent of the alleged infringer is not relevant.[1]

---

[1] Defendant insists that the accused structures "were developed to serve a structural function" which is inconsistent with preferential corrosion, and thus the accused structures are not sacrificial anodes and are not infringing. (Doc. No. 169, Def's Br., at 12). EPS and DTNA agree that regardless of what the accused structures are called or the intended purpose for the structures, if the structures meet the Court's claim construction, they infringe. (Doc. No. 177, Pl. Br., at 18–20, Doc. No. 193, Def.'s Reply Br., at 15–16). Because the Court finds that there is sufficient evidence to create a genuine issue of material fact as to whether the accused products are infringing, the Court declines to address DTNA's argument any further.

6

This Court has completed the first step in analyzing a claim for patent infringement—claim construction. In its Markman Order this Court accepted the parties agreed upon construction of a "sacrificial anode" as a "piece of metal used to protect another piece of metal by preferentially corroding." (Doc. No. 41 at 8).

In its brief, and at the motion hearing, (Doc. No. 226), DTNA engaged in lengthy discussion over the meaning of the word "protect," arguing that to "protect" the piece of metal it must totally "prevent" corrosion from occurring. Ultimately, this argument inserts issues of claim construction back into the mix. Using its definition of "protect," DTNA concludes that EPS is out of luck on its infringement claims because the testing results do not indicate that the presence of the accused devices result in total prevention of corrosion as DTNA argues should happen when a sacrificial anode is present to "protect" the other piece of metal. Under DTNA's preferred construction, if the piece of metal sought to be protected corrodes at all, then the piece of metal tasked with preferentially corroding and protecting cannot be said to have protected the other piece of metal.

EPS argues that "protect" and "prevent" are not interchangeable, and the Court should proceed with the agreed upon construction, wherein the word "protect" and not "prevent" is found.

"[D]istrict courts may engage in a rolling claim construction, in which the court revisits and alters its interpretation of the claim terms as its understanding of the technology evolves." *Pressure Prod. Med. Supplies, Inc. v. Greatbatch Ltd.*, 599 F.3d 1308, 1316 (Fed. Cir. 2010) (first quoting *Pfizer, Inc. v. Teva Pharm., USA, Inc.*, 429

F.3d 1364, 1377 (Fed. Cir. 2005); and then citing *Utah Med. Prods., Inc. v. Graphic Controls Corp.,* 350 F.3d 1376, 1381–82 (Fed. Cir. 2003)). When the inventor does not act as a lexicographer or disavow claim scope for a term, the plain and ordinary meaning controls. *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014). Here, the inventor neither acted as a lexicographer nor disavowed the claim scope of the term "protect." Thus, the plain and ordinary meaning controls.

The Court agrees with Plaintiff EPS that "protect" in general usage includes but does not require total prevention. (Doc. No. 226 at 32:24–33:1 ("You're protecting that tube because it's not losing as much as it otherwise would have.")). It appears to the Court that neither Plaintiff EPS's product nor the accused products have found the silver bullet for ending all corrosion caused by electrolysis in radiators. More realistically, to the extent that electrolysis prevention materials are present in EPS's patented product or the accused products, they have sought to protect radiators from electrolysis in a way that staves off its inevitable demise for a while longer. Thus, the word "protect" within the claim construction of a sacrificial anode does not describe a total prevention. Instead, it describes some protection. Construing the term any other way would likely exclude EPS's patented product itself, and the Court observes that a claim construction that would exclude the inventor's device is rarely the correct interpretation. *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007).

Therefore, the question now becomes whether EPS presents sufficient evidence to show that the accused products contain a "piece of metal used to protect another

piece of metal by preferentially corroding," where "protect" means the "piece of metal" offers some, but not absolute, protection. (Doc. No. 41 at 8).

EPS points to evidence from which a reasonable jury could find that the accused products contain a "sacrificial anode" and infringe the patent-in-suit.[2] To show infringement, Plaintiff EPS points to the reports of its expert, Mr. Nranian and testing performed by Mr. Krantz. (Doc. No. 177, Pl. Br., at 22; Doc. No. 177-6, Nranian Opening Rep.). Mr. Nranian expresses his opinion that the accused products meet "every limitation of each Asserted Claim." (Doc. No. 177-6, Nranian Opening Rep. at ¶ 55). Further, Mr. Nranian explains that he reviewed the testing conducted by Mr. Bradley Krantz to conclude that the accused products meet the Court's claim construction of a sacrificial anode. (*Id.* at ¶ 79–88). In reviewing the testing, Mr. Nranian concluded that each of the accused products contains a sacrificial anode "because they are each a piece of metal used to protect another piece of metal . . . by preferentially corroding." (*Id.* at ¶ 105). Discussing the testing results, he explained that the difference in values in the mass loss, corrosion rate, and mass loss rate between the "Tubes without Anodes" and the "Tubes with Anodes" in the Benchtop Test Results inform his opinion that the accused products contain sacrificial anodes which preferentially corrode to protect the tubes. (Doc. No. 177-6, Nranian Rep., at ¶ 106; Doc. No. 177-6, App'x C, Krantz Testing Rep., at 114–17). Mr. Nranian also

---

[2] Some of the evidence discussed herein was subject to motions to strike and exclude pursuant to *Daubert*. (Doc. Nos. 163, 186). Those motions were denied. (Doc. No. 230). Accordingly, arguments regarding the exclusion of that evidence are not addressed here.

9

detailed the impact of volume resistivity displayed in the testing, noting that lower volume resistivity inserts attract more stray current which allows them to preferentially corrode before the tube. (Doc. No. 177-6, Nranian Rep., at ¶ 107; Doc. No. 177-6, App'x C, Krantz Testing Rep., at 114–17). As to evidence regarding an "anode holder" as asserted in claim 37, EPS presents evidence that the accused products have an "anode holder" in its expert reports. (Doc. No. 177-6, Nranian Rep., at ¶¶ 148–151).

Here, contrary to DTNA's view, the evidence presented by EPS shows that there are genuine issues of material fact as to whether the accused products meet the Court's claim construction of a sacrificial anode and contain anode holders. Sufficient evidence exists such that a reasonable jury could find infringement. Thus, it is for the jury to decide whether the accused structures infringe the patent-in-suit. Therefore, Defendant's motion for summary judgment as to noninfringement is denied.

## B. Defendant DTNA is not entitled to summary judgment as to priority date.

DTNA observes that the law requires corroboration of conception and reduction to practice before an inventor can claim an earlier priority date. (Doc. No. 169 at 20). DTNA contends that because EPS does not proffer evidence which can provide corroboration of its claimed conception date or reduction to practice, summary judgment denying Plaintiff's claimed priority date should be granted. (Doc. No. 169 at 21, 26). In response, EPS contends that issues of fact exist regarding whether Plaintiff should be entitled to a priority date before September 30, 2008, and that Mr. Catalano reduced the invention to practice by March 2008. (Doc. No. 177 at 24, 26).

"[P]riority of invention goes to the first party to reduce an invention to practice unless the other party can show that it was the first to conceive of the invention and that it exercised reasonable diligence in later reducing that invention to practice." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1169 (Fed. Cir. 2006) (quoting *Cooper v. Goldfarb,* 154 F.3d 1321, 1327 (Fed. Cir. 1998)). "[A] patentee bears the burden of establishing that its claimed invention is entitled to an earlier priority date than an asserted prior art reference." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1376 (Fed. Cir. 2016) (citing *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1379 (Fed. Cir. 2015)). Accordingly, the patentee has the burden of production to proffer evidence which supports an earlier priority date. *Id.* at 1375–76.

### 1. Conception

Conception is the "formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice." *Dawson v. Dawson*, 710 F.3d 1347, 1352 (Fed. Cir. 2013) (citing *Hybritech Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1376 (Fed. Cir. 1986)). "A conception must encompass all limitations of the claimed invention and is complete only when the idea is so clearly defined in the inventor's mind that only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation." *Singh v. Brake*, 222 F.3d 1362, 1367 (Fed. Cir. 2000) (cleaned up) (first citing *Kridl v. McCormick,* 105 F.3d 1446, 1449, 41 USPQ2d 1686, 1689 (Fed. Cir. 1997); and then quoting *Burroughs Wellcome Co. v. Barr Lab., Inc.,* 40 F.3d 1223, 1228, 32 USPQ2d 1915, 1919 (Fed. Cir. 1994)).

11

"Conception is a question of law based on underlying facts." *Singh v. Brake*, 222 F.3d 1362, 1367 (Fed. Cir. 2000) (citing *Eaton v. Evans,* 204 F.3d 1094, 1097, 53 USPQ2d 1696, 1698 (Fed. Cir. 2000)).

"An inventor can swear behind a reference by proving he conceived his invention before the effective filing date of the reference and was diligent in reducing his invention to practice after that date." *Apator Miitors ApS v. Kamstrup A/S*, 887 F.3d 1293, 1295 (Fed. Cir. 2018) (citing *Perfect Surgical Techniques, Inc. v. Olympus Am., Inc.*, 841 F.3d 1004, 1007 (Fed. Cir. 2016)). However, a party who "seeks to prove conception through an inventor's testimony" must present evidence beyond the inventor's own statements and documents to corroborate the inventor's testimony. *Id.* "[E]vidence of corroboration must not depend solely on the inventor himself." *Cooper v. Goldfarb*, 154 F.3d 1321, 1330 (Fed. Cir. 1998) (first citing *Reese v. Hurst,* 661 F.2d 1222, 1225, 211 U.S.P.Q. 936, 940 (CCPA 1981); then citing *Hahn v. Wong,* 892 F.2d 1028, 1032, 13 U.S.P.Q.2d 1313, 1317 (Fed.Cir.1989)).

"There is no particular formula that an inventor must follow in providing corroboration of his testimony of conception. Rather, whether a putative inventor's testimony has been sufficiently corroborated is determined by a "rule of reason" analysis, in which an evaluation of all pertinent evidence must be made so that a sound determination of the credibility of the inventor's story may be reached." *Singh v. Brake*, 222 F.3d 1362, 1367 (Fed. Cir. 2000) (cleaned up). "This rule-of-reason analysis does not require every aspect of an inventor's testimony to be explicitly

12

corroborated with a source independent of the inventor." *Mosaic Brands, Inc. v. Ridge Wallet LLC*, 55 F.4th 1354, 1363 (Fed. Cir. 2022) (citations omitted).

The rule of reason analysis looks to the following criteria to determine whether the corroboration requirement is met: (1) the relationship between the corroborating witness and the alleged prior user, (2) the time period between the event and trial, (3) the interest of the corroborating witness in the subject matter in suit, (4) contradiction or impeachment of the witness' testimony, (5) the extent and details of the corroborating testimony, (6) the witness' familiarity with the subject matter of the patented invention and the prior use, (7) the probability that a prior use could occur considering the state of the art at the time, and (8) the impact of the invention on the industry, and the commercial value of its practice. *Woodland Tr. v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1371 (Fed. Cir. 1998).

Thus, "[w]hether testimony is sufficiently corroborated is ultimately a question of fact." *Id.*; *see also Nobel Biocare Servs. AG v. Instradent USA, Inc.*, 903 F.3d 1365, 1378 (Fed. Cir. 2018), *as amended* (Sept. 20, 2018) (citing *Fleming v. Escort Inc.*, 774 F.3d 1371, 1377 (Fed. Cir. 2014)).

Documentary evidence made contemporaneously with the conception of the invention is the most reliable form of corroboration. *Mosaic Brands, Inc. v. Ridge Wallet LLC*, 55 F.4th 1354, 1364 (Fed. Cir. 2022). But the fact that corroborating materials, like notebook entries, are witnessed several months to a year after the entry "does not necessarily disqualify" them from serving as corroboration "in view of other corroborating evidence." *Woodland Tr.*, 148 F.3d at 1369 (citing *Hybritech Inc.*

13

*v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1378, 231 USPQ 81, 89 (Fed. Cir. 1986)). "[C]orroborating evidence is taken as a whole; conception of an entire invention need not be reflected in a single source." *Univ. of Pittsburgh of the Commonwealth Sys. of Higher Educ. v. Hedrick*, 573 F.3d 1290, 1298 (2009) (citing *Price v. Symsek*, 988 F.2d 1187, 1196 (Fed. Cir. 1993)).

The Court now turns to various cases to illustrate the varying levels of evidence under which courts have and have not found that a reasonable jury could conclude that there was sufficient corroboration of conception.

*Mosaic* provides an example of the preferred, documentary evidence of corroboration. In *Mosaic*, the inventor testified that his invention was first sold in 2011. *Mosaic Brands, Inc. v. Ridge Wallet LLC*, 55 F.4th 1354, 1364 (Fed. Cir. 2022). As support, he attached two documents to his declaration: design plans for the invention from October 2010 and invoices seemingly showing that the invention was sold at a trade show in 2011. *Id.* The Federal Circuit concluded that if a reasonable factfinder credits the inventor's testimony and "finds his documents to be authentic, which she could, this collection of evidence would provide a sufficient basis from which the factfinder could find that the [invention] was on sale by 2011." *Id.*

Pointing to the district court's apt observations, the Federal Circuit explained that the design drawing documents attached to the inventor's declaration could be found to be the "most reliable" form of corroboration in that it is documentary evidence that was created contemporaneously with the events requiring corroboration. *Id.* The Federal Circuit held that the district court did not err in

finding that the plaintiff presented "legally sufficient" evidence of corroboration of the inventor's testimony regarding the date of the invention. *Id.* In holding that the district court went too far in finding the evidence of corroboration was credible and granting summary judgment on anticipation, the Court made clear that when legally sufficient evidence of corroboration is presented, whether the evidence presented is credible should, of course, be left to the jury. *Id.* at 1365.

*Hybritech* featured less-than-ideal corroboration, namely the "sparsely documented work of a start-up company." *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1376 (Fed. Cir. 1986). There, the Federal Circuit reversed the district court's finding that there was no clear or corroborated evidence regarding "when before May 1980" the idea of for the claimed invention was conceived. *Id.* The Federal Circuit found that "the Hybritech laboratory notebooks and the nature of Hybritech's research program fully corroborate the testimonial evidence of conception" and support the holding that Hybritech conceived the claimed invention at its stated time. *Id.* at 1376–77. At issue as means of corroboration were laboratory notebooks, some of which were unwitnessed until later. *Id.* at 1376. The Federal Circuit concluded that "[t]he laboratory notebooks, alone, are enough to show clear error in the findings that underlie the holding that the invention was not conceived before May 1980. That some of the notebooks were not witnessed until a few months to one year after their writing does not make them incredible or necessarily of little corroborative value." *Id.* at 1378. Observing the nature of Hybritech as a young and growing company that "failed to have witnesses sign the inventors' notebooks

contemporaneously with their writing," the Court concluded that "[u]nder a reasoned analysis and evaluation of all pertinent evidence . . . Hybritech, within a reasonable time thereafter, prudently had researchers other than those who performed the particular experiments witness the notebooks." *Id.* The Court noted that the "notebooks clearly show facts underlying and contemporaneous with conception of the claimed invention and in conjunction with the testimony of [the inventors], and others, are altogether legally adequate documentary evidence, under the law pertaining to conception, of the formation in the minds of the inventors of a definite and permanent idea of the complete and operative invention." *Id.*

*Apator* provides an example of when the proffered evidence of corroboration is not legally sufficient. *See Apator Miitors ApS v. Kamstrup A/S*, 887 F.3d 1293 (Fed. Cir. 2018). In *Apator*, the Federal Circuit addressed whether substantial evidence supported the United States Patent and Trademark Office Patent Trial and Appeal Board's finding that Apator failed to sufficiently corroborate inventor's testimony of conception. *Id.* at 1294. The Court concluded that substantial evidence supported the Board's finding that Apator failed to sufficiently corroborate the inventor's testimony of conception at the asserted date because Apator failed to proffer any evidence of the invention's conception that was not supported solely by the inventor. *Id.* at 1296. The proffered evidence consisted of emails from the inventor and drawings produced by the inventor. *Id.* The first email was written by the inventor wherein he discusses his new findings and states that a sample of these findings is attached. *Id.* In the second email, the inventor discusses his "latest project" and notes that he attached a

16

presentation. *Id.* The emails did not provide the attached files such that one could tell what was included within the original attachment. *Id.* Further, the drawings which the inventor submitted noted they were modified two years after the purported conception date, but the inventor claimed based on his file-naming convention, it was actually created earlier. *Id.* However, no evidence addressed this file-naming convention. *Id.* In sum, the Court concluded that the fatal flaw for the proffered corroboration evidence was its inventor dependence—none of the evidence could stand apart from the inventor's testimony and establish corroboration. *Id.*

Lastly, in *Opticurrent*, the District Court for the Northern District of California addressed conception and held that a dated drawing created by the inventor which contained three unauthenticated signatures, claiming to have read and understood the drawing, was sufficient to raise a genuine issue of material fact as to corroboration and therefore conception. *Opticurrent, LLC v. Power Integrations, Inc.*, No. 17-CV-03597-WHO, 2018 WL 1730326, at *4 (N.D. Cal. Apr. 10, 2018), *on reconsideration,* No. 17-CV-03597-WHO, 2018 WL 3956423 (N.D. Cal. Aug. 17, 2018) (finding the claimed priority date established by affidavit evidence).

Here, EPS seeks to establish a priority prior to September 30, 2008; specifically, plaintiff seeks a July/August 2007 priority date, noting that the invention was conceived of prior to that date. (Doc. No. 177 at 24). DTNA argues that none of the corroborating documents show anything about the claimed invention. (Doc. No. 169 at 21). DTNA contends that of the 69 documents cited by Plaintiff in its second supplemental response to Interrogatory 1, (Doc. No. 162-9, Plaintiff's Second Supp.

Resp. to Interrogatories No. 1, 5, and 6, at 4–7), none are sufficient to corroborate the inventor's conception testimony. (Doc. No. 169, Def's Memo SJ, at 21). EPS responds that "[t]he only specific claim element that Defendant contends is not corroborated is the location of the sacrificial anode being within 10 inches of the radiator inlet[,]" and that this gap in corroboration is not fatal to Plaintiff's priority contentions under *Mosaic*. (Doc. No. 177, Pl. Resp. Memo, at 25). Further, EPS asserts that the fact that the inventors disclosed the location of the anode to his father, Charles Catalano, during their 2007 meeting is corroborated by testimony and documentary evidence. (Doc. No. 177, Pl. Resp. Memo, at 25).

EPS presents evidence from which a fact finder could conclude a conception date as early as July or August 2007. Further, evidence exists from which a reasonable jury could conclude that the conception date was sufficiently corroborated by one other than the inventor himself.

The inventor Frank Catalano claims he conceived of his invention in July or August of 2007. (Doc. No. 179, F. Catalano Decl., at 2). He anchors this date to the birth of his son who was born in June 2007. (*Id.*). Frank Catalano explains that he met with his dad, Charles Catalano, in July or August 2007 and shared his idea that is the subject of the patent-in-suit. (*Id.* at 3). He claims that he described to his father that his idea "that locating a piece of metal near the inlet would cause the stray electric current to attack, or corrode, the anode as opposed to the other parts of the radiator, such as the tubes, header, etc." (*Id.*). Further, he explained to his father that the "location of the weaker or more otherwise more attractive metal was important"

and this included locating the piece of metal within 10 or 12 inches of the inlet. (*Id*.). Notably, the inventor does not assert that he conceived of locating the sacrificial anode within 10 inches of the inlet at this point. During this meeting, Frank Catalano claims he drew diagrams for his father. (*Id*.). Frank Catalano asserts that Document EPS000866, (Doc. 179-3), is representative of the diagrams he drew for his father, though he admits he did not retain his original notes from the meeting. (*Id*.). Document EPS000866, (Doc. 179-3), provides that the inlet will be located within "12 [inches] off inlet connection" rather than 10 inches, which is required by the patent claims. Frank Catalano declares that he had developed a prototype that was ready for testing by March 2008, noting that he began testing his invention "by installing [the anode] inside the radiators of Ford F-150 trucks within 10 inches of the inlet." (Doc. No. 179, F. Catalano Decl., at 5).

To corroborate the inventor's claimed conception date, Plaintiff points to the deposition testimony of the inventor's father, Charles Catalano. (Doc. No. 177, Pl. Resp. Memo, at 25). Charles Catalano, discussed a meeting at Frank's house in the summer of 2007, after the birth of Frank's son, where Frank showed him drawings and pictures regarding his invention. (Doc. No. 180-1, C. Catalano Depo., at 34:16–35:4; 44:8–50:6; 63:21–66:12). During his deposition, Charles Catalano was shown a document, EPS 000866, (Doc. No. 179-3), which Charles recognized as a drawing of Frank's that he used to show him the invention. (Doc. No. 180-1, C. Catalano Depo., at 63:7–64:24). Charles Catalano testified at his deposition that he recalled his son, Frank Catalano, "talking about [the location of the anode with respect to the inlet],"

but he could not recall "how many inches it was away." (Doc. No. 180-1, C. Catalano Depo., at 65:23–66:4). Further, he testified that he knew that "later on at some time he said it was ten inches," but he did not know "when exactly it changed." (Doc. No. 180-1, C. Catalano Depo., at 66:2–66:12). Charles also testified to discussions on "that Sunday morning" involving how Frank would "weld the aluminum bong that would hold [the anode] in the radiator." (Doc. No. 180-1, C. Catalano Depo., at 68:23–70:19). Charles also explained that his conversations with Frank included discussion about the type of metal Frank would choose to build the anode and why he sought to use any specific type of metal. (Doc. No. 180-1, C. Catalano Depo., at 77:6–80:25).

Moving on to the deposition of Misty Leighton-Petrosino, Frank Catalano's ex-wife, she testified that Frank Catalano came up with the patented invention and "talked about it incessantly" and made drawings of it. (Doc. No. 180, M. Leighton-Petrosino Depo., at 34:22–35:23). She testified that she recalled Frank Catalano talking about issues relating to his patent around 2007, recalling the birth of her son in June 2007. (Doc. No. 180, M. Leighton-Petrosino Depo., at 36:23–38:4). She also recalled seeing drawings related to the invention around June or July 2007 and that Frank Catalano talked about "anodes" and "electrolysis." (Doc. No. 180, M. Leighton-Petrosino Depo., at 39:15–41:15).

Frank Catalano's sister, Kelly Mariano, was also deposed and asked about his drawings. (Doc. No. 180-2, K. Mariano Depo, at 107:25–108:15). She reviewed an exhibit, (Doc. No. 179-3, EPS000866), and concluded that the "doodles" were the kind of drawings Frank Catalano would do and that she recognized the handwriting in the

20

document was Frank Catalano's. (*Id.* at 107:25–108:15). She also testified that she recalled overhearing a conversation related to electrolysis during the summer of 2007 which she considered "above [her] head." (*Id.* at 41:25–42:17).

The evidence provided creates a genuine issue of material fact as to the conception date and the corroboration of that date. Legally sufficient evidence has been produced such that a reasonable jury could credit the evidence and conclude that Plaintiff's claimed conception date is sufficiently corroborated. The testimony of Charles Catalano, Misty Leighton-Petrosino, and Kelly Mariano, all speak to the meeting between Charles and Frank, wherein the invention was disclosed. The evidence presented here is akin to *Hybritech*, where the evidence was less-than-ideal, but looking at the evidence as a whole, it would allow a reasonable juror to find corroboration of an earlier conception date. 802 F.2d at 1378. Even though the notebooks at issue in *Hybritech* were not witnessed until months later, the notebooks combined with the testimony of the inventors and others showed "formation in the minds of the inventors of a definite and permanent idea of the complete and operative invention." *Id.* Likewise, in this case, there are drawings which witnesses affirm are the inventor's handwriting and similar to what was shown at the summer gathering in July or August 2007. (Doc. No. 180-1, C. Catalano Depo., at 63:7–64:24; Doc. No. 180-2, K. Mariano Depo., at 107:25–108:15). Further, while the drawing details placing the anode 12 inches from the inlet, the testimony of Charles Catalano, corroborates that it was eventually solidified at 10 inches. (Doc. No. 180-1, C.

Catalano Depo., at 65:23–66:12). This evidence is legally sufficient to allow the jury to determine if Plaintiff is entitled to an earlier priority date.

The evidence presented here is also distinguishable from *Apator*. In *Apator*, the proffered evidence was emails from the inventor and drawings created by the inventor. 887 F.3d at 1296. Neither the dates on the drawings nor the file naming conventions of the documents were supported by anything other than the inventor's testimony. *Id*. In contrast, here, several witnesses attest to seeing similar drawings, and at least one witness other than the inventor recalls learning of the specifics of the invention, including the discussion of anodes, the distance of the anode from the inlet, and the metals used. (Doc. No. 180-1, C. Catalano Depo., at 65:23– 66:12, 68:23– 70:19,77:6–80:25; (Doc. No. 180, M. Leighton-Petrosino Depo., at 39:15–41:15).

Defendant relies heavily on Plaintiff's lack of contemporaneous documentation to defeat Plaintiff's corroboration evidence at this stage. (Doc. No. 169, Def. Br., at 22; Doc. No. 193, Def. Reply, at 20–21). *Mosaic Brands, Inc.*, 55 F.4th at 1364 (noting that documentary evidence made contemporaneously with the conception of the invention are the most reliable form of corroboration). But, while that would be preferred, it is not required under the law. *Singh*, 222 F.3d at 1367 ("There is no particular formula that an inventor must follow in providing corroboration testimony of conception. . . . [A]n evaluation of all pertinent evidence must be made so that a sound determination of the credibility of the inventor's story may be reached."). The key requirement of corroboration evidence is that it does not depend solely on the inventor himself. *See Cooper*, 154 F.3d at 1330. Here, evidence exists beyond the

22

inventor himself which could corroborate his testimony as to the invention's conception date.

Defendant also argues that the witnesses are "interested parties," and thus, it follows, incapable of providing sufficient corroboration as a matter of law. (Doc. No. 169, Def. Br., at 25). *Woodland Tr.*, 148 F. 3d at 1372–73 (addressing the interest of the corroborating witness in the subject matter of the suit and the relationship between the corroborating witness and the inventor as factors in the rule of reason analysis). However, the interest of the witness is just one factor of many for the jury to consider in assessing credibility of the witnesses and the corroboration evidence offered. Plaintiff's proffered evidence corroborating conception is far from ideal, but it is legally sufficient to create a genuine issue of material fact as to corroboration of the inventor's claimed conception date. Thus, the evidence presented establishes a genuine issue of material fact which precludes summary judgment on the conception date.

### 2. *Reduction to Practice*

Moving on to the next step of establishing an earlier priority date, "[i]n order to establish an actual reduction to practice, the inventor must prove that: (1) he constructed an embodiment or performed a process that met all the limitations . . . ; and (2) he determined that the invention would work for its intended purpose." *Cooper*, 154 F.3d at 1327.

Further, "[i]n order to establish an actual reduction to practice, an inventor's testimony must be corroborated by independent evidence." *Id.* at 1330 (citing *Knorr*

*v. Pearson,* 671 F.2d 1368, 1373, 213 U.S.P.Q. 196, 200 (CCPA 1982)). "[A]n actual reduction to practice does not require corroboration for every factual issue contested by the parties." *Id.* (citing *Ethicon, Inc. v. United States Surgical Corp.,* 135 F.3d 1456, 1464, 45 U.S.P.Q.2d 1545, 1551 (Fed.Cir.1998); *Mann v. Werner,* 52 C.C.P.A. 1578, 347 F.2d 636, 640, 146 U.S.P.Q. 199, 202 (1965)). However, "corroboration of the existence of the device is not sufficient . . . to establish corroboration of reduction to practice. It is also necessary to corroborate that the device worked for its intended purpose." *In re Garner*, 508 F.3d 1376, 1381 (Fed. Cir. 2007) (citing *Hahn v. Wong,* 892 F.2d 1028, 1032 (Fed.Cir.1989)). In addition, "[a] party that is first to conceive but second to reduce to practice may nonetheless show priority if it can establish diligence. Precedent requires that an inventor's testimony concerning his diligence be corroborated." *Opticurrent, LLC,* 2018 WL 1730326, at *6 (quoting *Brown v. Barbacid*, 436 F.3d 1376, 1380 (Fed. Cir. 2006)). Diligence is a question of fact. *In re Meyer Mfg. Corp.*, 411 F. App'x 316, 319 (Fed. Cir. 2010).

> Reasonable diligence must be shown throughout the entire critical period, which begins just prior to the competing reference's effective date, and ends on the date of the invention's reduction to practice. The diligence need only be reasonably continuous, permitting periods of inactivity within the critical period. However, the showing of diligence must be sufficient to assure that, in light of the evidence as a whole, the invention was not abandoned or unreasonably delayed.

*Meta Platforms, Inc. v. Angel Techs. Grp. LLC*, No. IPR2023-00059, 2023 WL 5158227, at *8 (P.T.A.B. May 11, 2023) (cleaned up) (quoting *Perfect Surgical Techniques, Inc. v. Olympus America, Inc.*, 841 F. 3d 1004, 1007, 1009, 1010–11 (Fed. Cir. 2016)).

24

EPS has presented sufficient evidence from which a reasonable jury could find diligent reduction to practice. Frank Catalano explained in his declaration that after his meeting with his father, he began developing a prototype. (Doc. No. 179 (F. Catalano Decl.) at 4). This development continued into Fall 2007 and into 2008. *Id.* at 4–5. He noted that by March 2008, his prototype was ready to be tested. *Id.* at 5. The testing concluded in September 2008. *Id.* The results of the testing showed that the anodes experienced "substantial pitting and corrosion" but "the radiators did not experience any failure." *Id.* at 6. Frank Catalano explained that he consistently and continuously worked on his invention from March to September 2008. *Id.*

Documents and witness testimony exist to corroborate Frank Catalano's description of events in reducing his invention to practice. The document marked EPS000875 contains Frank Catalano's notes in short form and indicates he tested the anode in Ford F-150 trucks beginning in March 2008. (Doc. No. 179-5 (EPS000875) at 2). He checked on the anodes and the radiators throughout the testing and noted in September 2008 the results of the testing that the radiators had not been ruined by electrolysis. *Id.* Plaintiff also presents photos of the anodes before and after six months in the radiator. (Doc. No. 179-4). The after photos show corrosion of the anode. *Id.*

Further, in Charles Catalano's deposition, he testified that Frank Catalano was "making the actual anode and trying it in different vehicles" in late 2007 or early 2008. (Doc. No. 180-1, C. Catalano Depo., at 94:17-96:6). He testified that he vaguely remembered a Ford F-150 being tested. *Id.* at 121:16-122:7. In addition, Charles

Catalano recalled that from the time Frank conceived of the invention in July 2007, he never took a break from working on the anode. *Id.* at 154:23-155:17.

In sum, the inventor claims that he began testing his anode in March 2008 and completed testing in September 2008. His notes, created in October 2008, indicate the same time, and the notes detail that the testing was successful. Further, Charles Catalano's testimony speaks to the testing during this identified time period. And photographic evidence indicates that the anode was successful.

In response to Plaintiff's proffered documentary evidence of the inventor's notes, Defendant asserts that based on meta data reports, Frank Catalano's notes were created in October 2008—too late according to Defendant. (Doc. No. 193, Def. Reply, at 22; Doc. No. 162-10, Meta Data, at 2). That is not fatal to corroboration. The notes appear to have been made contemporaneously with the conclusion of testing.

Further, the bulk of Defendant's argument on reduction to practice asserts that the reduction to practice of the invention is without sufficient corroboration and that Frank Catalano lacked diligence in his reduction to practice. (Doc. No. 169, Def. Br., at 26–27). As detailed above, there is legally sufficient evidence of corroboration. If a jury credits the evidence, it could find the inventor's reduction to practice is corroborated. As to diligence, the inventor's and Charles Catalano's statements describe that the inventor continued to work on his invention during the time period from conception to September 2008. A reasonable juror could find that Frank Catalano was diligent in reducing his invention to practice.

26

Therefore, for the reasons explained above, summary judgment as to Plaintiff's claimed priority date is improper, and Defendant's motion for summary judgment on that issue is denied.

### C. Defendant DTNA is entitled to summary judgment as to pre-suit damages.

DTNA argues that EPS is not entitled to pre-suit damages because the inventor, Frank Catalano, did not provide constructive notice by marking patent-practicing articles, and Plaintiff did not give actual notice of the asserted patent to Defendant until the filing of the lawsuit on April 19, 2021. (Doc. No. 169 at 28). Defendant concludes that because Plaintiff is not entitled to pre-suit damages as a matter of law, summary judgment should be granted in its favor. (Doc. No. 169 at 28). Plaintiff argues that Frank Catalano did not sell patent-practicing products, so summary judgment in DTNA's favor as to pre-suit damages is inappropriate. (Doc. No. 177 at 27).

Under 35 U.S.C. § 287(a), "[p]atentees, and persons making, offering for sale, or selling within the United States any patented article . . . may give notice to the public that the same is patented, either by fixing thereon the word "patent" or the abbreviation "pat.", together with the number of the patent[.]" This is known as marking. "In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter[.]" 35 U.S.C. § 287(a).

Products must be marked irrespective of size. The statute provides ways in which smaller articles can be marked by allowing that when "from the character of the article, [marking cannot] be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice" will suffice. 35 U.S.C. § 287(a).

"Pursuant to 35 U.S.C. § 287(a), a patentee who makes or sells a patented article must mark his articles or notify infringers of his patent in order to recover damages." *Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*, 876 F.3d 1350, 1365 (Fed. Cir. 2017) (citing *Dunlap v. Schofield*, 152 U.S. 244, 248 (1894)). "If a patentee who makes, sells, offers for sale, or imports his patented articles has not 'given notice of his right' by marking his articles pursuant to the marking statute, he is not entitled to damages before the date of actual notice." *Id.* at 1366 (citation omitted).

"[A] patentee who never makes or sells a patented article may recover damages even absent notice to an alleged infringer." *Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*, 950 F.3d 860, 864 (Fed. Cir. 2020). But, as noted above, once "a patentee makes or sells a patented article and fails to mark in accordance with § 287, the patentee cannot collect damages until it either begins providing notice or sues the alleged infringer." *Id.* Accordingly, "cessation of sales of unmarked products" will "not fulfill . . . notice obligations under § 287," nor will it "remove the notice requirement imposed by the statute." *Id.* at 865.

Frank Catalano's testimony establishes that he never marked any product that he sold. He testified that he placed a sign in the shop but that no sticker was affixed

28

to the anodes sold. (Doc. No. 162-18, F. Catalano Depo., at 366:20—367:13). Further, Plaintiff does not dispute that the products sold were never marked. (*See* Doc. No. 177 at 27—32).

Thus, there is no dispute as to whether any items were marked. Only two issues are argued: the effect of the reissue patent on Plaintiff's obligation to mark and whether the inventor ever sold products practicing the claims of the patent such that the marking statute applies.

### 1. *The Effect of Reissue*

DTNA argues that EPS's failure to mark is not excused by Frank Catalano's reissue proceedings, as the original patent remained in force during the reissue proceedings. (Doc. No. 169 at 31). Plaintiff contends that any failure to mark under the original patent is not imputable to the patent-in-suit because the amended or new claims in the reissue patent speak from the date of reissue. (Doc. No. 177 at 25). It appears that as Plaintiff sees it, the reissuance of the patent, provided Plaintiff with a renewed opportunity to mark, and if the inventor never sold a product after reissue, then there is no obligation to mark and no bar on damages from the point of reissue. (*Id.*).

Section 252 declares that "every reissued patent shall have the same effect and operation in law, on the trial of actions for causes thereafter arising, as if the same had been originally granted in such amended form[.]" 35 U.S.C. § 252. Further, "in so far as the claims of the original and reissued patents are substantially identical, such surrender shall not affect any action then pending nor abate any cause of action then

29

existing, and the reissued patent, to the extent that its claims are substantially identical with the original patent, shall constitute a continuation thereof and have effect continuously from the date of the original patent." 35 U.S.C. § 252.

In *Flatworld*, the District Court for the District of Delaware observed that under the plain language of section 252, "a patent undergoing reissue remains in force during the reissue proceedings, and an accused infringer may be liable for infringing activity occurring during the reissue prosecution." *Flatworld Interactives LLC v. Samsung Elecs. Co.*, 77 F. Supp. 3d 378, 386–87 (D. Del. 2014). Thus, the district court concluded that "the reissue proceedings did not absolve the marking requirements of § 287" because the original patent remained in force during the reissue proceedings. *Id.* at 387.

It is well established that "the marking statute serves three related purposes: 1) helping to avoid innocent infringement; 2) encouraging patentees to give notice to the public that the article is patented; and 3) aiding the public to identify whether an article is patented." *Nike, Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437, 1443 (Fed. Cir. 1998) (cleaned up). "The marking statute protects the public's ability to exploit an unmarked product's features without liability for damages until a patentee provides either constructive notice through marking or actual notice." *Rembrandt Wireless Techs., LP v. Samsung Elecs. Co.*, 853 F.3d 1370, 1383 (Fed. Cir. 2017) (citing *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 162 (1989)).

Further, once practicing products are placed in the marketplace, the only way to obtain damages is to begin providing notice—either through proper marking or

30

actual notice of infringement. In *Artic Cat II*, the Federal Circuit reasoned that "[t]he notice requirement to which a patentee is subjected cannot be switched on and off as the patentee or licensee starts and stops making or selling its product[,]" noting that "even after a patentee ceases sales of unmarked products, nothing precludes the patentee from resuming sales" and "unmarked products remain on the market, incorrectly indicating to the public that there is no patent." 950 F.3d at 865. Ultimately, the Federal Circuit concluded that "once a patentee begins making or selling a patented article, the notice requirement attaches, and the obligation imposed by § 287 is discharged only by providing actual or constructive notice." *Id.*

If the Court were to follow Plaintiff's reasoning, the effect of the reissue patent would provide Plaintiff with a renewed opportunity to mark. So, if the inventor never sold a product after reissue, then there would be no obligation to mark and no bar on damages from the point of reissue.

Plaintiff cites *Seattle Box* for the proposition that "new claims in the reissue patent speak from the date of reissue." (Doc. No. 177 at 32). For its assertion, Plaintiff latches onto the following language: "With respect to new or amended claims, an infringer's liability commences only from the date the reissue patent is issued." *Seattle Box Co. v. Indus. Crating & Packing, Inc.*, 731 F.2d 818, 827 (Fed. Cir. 1984). Defendant observes that *Seattle Box* had "nothing to do with marking" and that the Federal Circuit specifically addressed when an infringer's liability commences and not when the rights of the public commence under the marking statute. (Doc. No. 193 at 24).

31

Defendant cites *Rembrandt Wireless* to illustrate that reissue should not be permitted to subvert the purpose of the marking statute. In that case, the plaintiff's licensee sold products which practiced one of the claims of the plaintiff's patent without marking the products. *Rembrandt Wireless Techs.*, 853 F.3d at 1382. The defendant sought to limit the plaintiff's damages to those incurred after the defendant received notice of the patents once the complaint was filed; however, days later, the plaintiff withdrew the one claim practiced by the products from its infringement allegations and filed a statutory disclaimer, disclaiming the claim at issue. *Id.* The district court held that because a disclaimed patent claim is treated as if it never existed, the motion to bar pre-suit damages should be denied. *Id.* at 1382—83. The Federal Circuit reversed, finding that the district court's view "effectively provides an end-run around the marking statute and is irreconcilable with the statute's purpose." *Id.* at 1383. Focusing on "the rights of the public," the Federal Circuit observed that the district court's ruling allowed the disclaimer to "retroactively excuse its failure to mark," which the Federal Circuit could not square with the purpose of the marking statute to provide notice to the public. *Id.*

The reasoning of *Rembrandt Wireless* is applicable to the case at bar. Cases which apply section 252 indicate that a reissue patent does not subject would-be infringers to liability for claims that do not exist yet. But importantly, reissue patents do not disrupt litigation when claims are "substantially identical." Simply put, reissue patents are neither a sword for future litigation nor a shield from ongoing litigation. It makes sense that a would-be infringer could not be held liable for

infringing a patent for new claims in a reissue patent that were not claimed (and thus did not exist) under the prior patent. However, when an inventor places products in the marketplace and fails to mark those products, the chief concern regarding the public is assuring the public has notice that those materials are patented. Nothing before the Court indicates that a reissue patent resets the marking statute as if a product were never sold, allowing the patent-holder a do-over at marking.

Ultimately, the Court is persuaded that to the extent any patent-practicing products were sold prior to the reissue patent's issuance, those sales are imputed to the reissue patent. To allow Plaintiff to get a do-over on marking by reissue patent, would subvert the purpose of the marking statute and the generally understood effect of a reissue patent. Here, the inventor never marked anodes under the original or reissue patents. At all relevant times, Frank Catalano held a patent. Thus, to the extent he sold practicing anodes, they were never marked. Therefore, Defendant never had constructive notice. Once selling began it implicated the statute. The only statutorily prescribed manner to begin recovering damages once products are sold is proper marking—not obtaining a reissue patent.

### 2. *The Products Sold Practice the Claims*

DTNA argues that Frank Catalano failed to mark practicing anodes during the pendency of his original patent. (Doc. No. 169 at 28). In contrast, EPS argues that prior to the issuance of the patent-in-suit, which was a reissue patent, Frank Catalano did not make or sell any product that practiced the original patent claims, and thus, he had no obligation to mark. (Doc. No. 177 at 28). Here, there is no dispute

that Frank Catalano never marked the products that he sold. The only dispute is whether those products practiced the claims of the patent such that marking was required in order to collect pre-suit damages.

When marking disputes arise, "[t]he alleged infringer has the initial burden to articulate the products it believes are unmarked patented articles subject to section 287. The burden then shifts to the patentee to prove the products identified do not practice the patented invention." *Flexiworld Techs., Inc. v. Lexmark Int'l, Inc.*, No. CV 5:22-97-KKC, 2023 WL 2573872, at *7 (E.D. Ky. Mar. 20, 2023) (quoting *Artic Cat I*, 876 F.3d at 1368). The patentee must meet its burden of proving that the unmarked items did not practice the patent claims by a preponderance of the evidence. *Am. Tech. Ceramics Corp. v. Presidio Components, Inc.*, No. 14-CV-6544(KAM)(GRB), 2018 WL 1525686, at *5 (E.D.N.Y. Mar. 27, 2018) (citing *Nike, Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437, 1446 (Fed. Cir. 1998)). In other words, once the alleged infringer meets its burden to articulate the products it believes are unmarked patented articles, the patentee "need only come forward with evidence showing that a reasonable finder of fact could conclude, by a preponderance of the evidence" that the products at issue do not practice the patent-in-suit. *Id.* at *7. "Making such a showing requires specific facts showing that there is a genuine issue for trial." *Id.* (cleaned up).

DTNA points to Frank Catalano's testimony that he built radiators containing sacrificial anodes in 2009. (Doc. No. 169 at 28: Doc. No. 162-18, F. Catalano Depo., at 238:12—239:25; 365:15—366:4). DTNA contends that Frank Catalano acknowledged

34

these items were patented when he testified the following in response to a question about the type of metal he used in the sacrificial anode: "I patented because I knew that you would—people . . . I knew you could change the metal." (Doc. No. 169 at 28; Doc. No. 162-18, F. Catalano Depo., at 272: 9—372:19). Essentially, DTNA contends that all anodes sold by Frank Catalano were practicing and unmarked. This satisfies DTNA's initial burden, and thus, shifts the burden to EPS to show by a preponderance of the evidence that the products sold did not practice the claims of the patent. *See Arctic Cat Inc. I*, 876 F.3d 1350, 1366 (Fed. Cir. 2017); *Flexiworld Techs., Inc.*, 2023 WL 2573872, at *7.

EPS claims that Frank Catalano "never made or sold an electrolysis prevention device with an anode holder 'adapted to fit around the inlet connection' of the radiator." (Doc. No. 177 at 28). Instead, EPS alleges that all sacrificial anodes sold by Frank Catalano were installed using an anode holder in the form of a threaded fitting, also called a bong, that was welded into the header of the radiator. (*Id.*). Thus, according to EPS, the anodes sold did not practice claims 1 or 13—both of which require an anode holder that is adapted to fit around the inlet connection of an engine heat exchange component. (*Id.*).

As evidence that the anodes which were sold did not practice the claims of the patent, EPS presents the testimony of Frank Catalano. Frank Catalano set forth the following in his declaration:

> 25. I also previously manufactured a small number of sacrificial anode products, using the threaded fitting, or bong, anode holder design, and sold a few of these to customers of Webster Radiator. This design allowed for a cleaner, original-equipment-manufacture ("OEM") look.

35

These sales would have occurred off and on from approximately 2009 until Webster Radiator moved to its current, smaller location in late 2015, early 2016.

26. As discussed in my deposition, Webster Radiator used to make custom aluminum radiators for use in antique cars. In some of these custom aluminum radiators we would install a sacrificial anode by welding a threaded fitting, or bong, into the radiator and then screwing the sacrificial anode into the threaded fitting. However, Webster Radiator stopped doing this after late 2015, early 2016 when we downsized, and moved to a new, smaller location up the street. As part of that move, Webster Radiator got rid of a lot of the machining and welding equipment we used to have, including the equipment needed to make custom aluminum radiators and implement the threaded fitting, or bong, anode holder implementation of my invention.

27. I never made or sold an electrolysis prevention device with an anode holder "adapted to fit around the inlet connection" of a radiator as required by claims 1 and 13 of my original patent, U.S. Patent No. 8,236,145. Those claims were directed at the wire sleeve wrap around drop in anode holder implementation that I used as part of my testing. However, in my commercialization attempts I used the threaded fitting, bong, implementation. The threaded fitting, bong, implementation does not "fit around" or "through" the radiator inlet. Rather, the threaded anode holder is welded or otherwise secured into the side of the radiator to then receive the anode. It is not attached through or around the radiator inlet as required by claims 1 and 13 of my original patent.

(Doc. No. 179, F. Catalano Decl., at 7).

Frank Catalano also provided deposition testimony that he sold anodes, but the anodes did not practice the claims of the patent:

Q. So you have built aluminum radiators, yes?

A. We have built. I don't weld the aluminum.
. . .
Q. On those aluminum radiators, do you-all put sacrificial anodes?

A. We've built—we used to build a lot more. Our shop is a little bit smaller now, and the space is—we don't have a lot of the machining equipment we used to have. And what we did after 2009, '10, '11 till we

36

moved out of that building, I would—I would implement my anodes to them, yes. A lot of them, I put my anodes in them.

Q. So some of them, but not all, you would put anodes in?

A. Most of them . . .

. . .

Q. Okay. So when you-all built aluminum radiator, you would put a sacrificial anode in some of them, correct?

A. Some, yes.

Q. Okay. How would you do that?

. . .

A. Well, I would—I would take the anodes that we would make with the—and put them in a plastic thread. And then I would put the anode in it, and I would put a lead—a piece of threaded wire to go in the tip and push down so it would go and meet the anode.
So we'd run a ground wire to it, and I would have the magnesium anode inside of it. And it was a big round piece, like the size around of my finger-type thing, you know?

Q. So turn to your patent very briefly. Look at Figure 1A. Is that kind of what you're talking about?

A. What—what patent do you want? The reissued one or the first one?

Q. It's the same Figure 1A in either.

A. Yeah. Well, no. That's—that's the drop-in-around-the-neck—

Q. Okay.

A. –one.

Q. So how would what you put in the aluminum radiator differ from what's shown here?

A. Well, because if you go back—I put on there—this is like a drop-in for radiators that were already produced—

Q. Sure.

37

A. –that I could put around the neck. And the problem was, it was—you have to have the ground wire come out of the hose. It was—it wasn't perfect.

And then I put them on the tank, and that would require them putting a hole in the radiator for it. And then I also put it around—anywhere around the inlet.

And I—I personally would—would not like it on the core. I would like it on the tank. And I wouldn't want the metal to come in contact with the core if I wanted to prolong the life of the radiator in a—more beneficial way.

But I—I knew that they were going to put it on the core because that was going to be the way that they could cut me out of selling tons of anodes. So that's why I included the attached-to-the-core embodiment and weld it to the radiator core.

(Doc. No. 178-2, F. Catalano Depo., at 237:22—239:9; 239:22—241:24). Further testimony from Frank Catalano explains how he would "weld the bong" to implement the anodes that he sold. *Id.* at 365:20—366:5.

In addition, Plaintiff directs the Court to Charles Catalano's testimony that Frank showed him drawings and told him about "weld[ing] the aluminum bong that would hold the device in the radiator" and welding the bong to the header of the radiator. (Doc. No. 180-1, C. Catalano Depo., at 67:18—70:24; 72:13—75-1).

In *Packet Intelligence*, the Federal Circuit held that the evidence presented by the patentee was insufficient as a matter of law to carry its burden of proving that the product in question did not practice the claims of patent-in-suit. *Packet Intel. LLC v. NetScout Sys., Inc.*, 965 F.3d 1299, 1314 (Fed. Cir. 2020). There, the plaintiff relied on the inventor's testimony that the product at issue did not embody the invention. *Id.* But the inventor's testimony was found lacking in that he was not qualified as an expert and did not provide an infringement opinion regarding the particular product

38

at issue. *Id.* The Federal Circuit noted that even if the inventor had testified about the correct product and offered an expert opinion regarding whether the product practiced the asserted claim, "his conclusory testimony failed to address what claim limitations were purportedly missing from the product," and ultimately, would have been insufficient to carry the burden of proving that the product did not practice the patent-in-suit. *Id.*

In *Am. Tech. Ceramics Corp.*, the plaintiff failed to produce evidence to meet its burden when the evidence it produced only sought to call into question the validity of the testimony of the defendant's expert regarding whether the products that were sold practiced the claims of the patent. *Am. Tech. Ceramics Corp. v. Presidio Components, Inc.*, No. 14-CV-6544(KAM)(GRB), 2018 WL 1525686, at *7 (E.D.N.Y. Mar. 27, 2018). The district court concluded the Plaintiff produced no evidence showing a genuine issue for trial. *Id.*

Here, Frank Catalano asserts that the anodes sold did not practice Claims 1 and 13. His testimony attempts to describe the manner in which he installed anode holders, including his testimony that he did not implement the anodes in the manner described in Figure 1A of the patent. But, this testimony, even if credited by the jury, is not enough to result in a finding that the anodes at issue did not practice the claims of the patent and thus, were not subject to the marking statute. On this issue, Plaintiff EPS has the burden to prove that it complied with the marking statute. Testimony from only the inventor which states that the products sold did not practice the claims of the patent is not sufficient to avoid summary judgment. To show a

39

genuine issue of material fact, there must be evidence from which a reasonable jury could find for Plaintiff. *Anderson*, 477 U.S. at 248. Here, Plaintiff fails provide any expert testimony or any evidence of the products sold from which a jury could find by a preponderance of the evidence that the products did not practice the claims of the patent. The Court is left with only the inventor's say-so that the products sold did not practice the claims of the patent and a brief explanation as to why not. Considering the evidence in the light most favorable to Plaintiff EPS, EPS cannot meet its burden that its unmarked products did not practice the claims of the patent.

Lastly, the parties devote significant argument in their briefs to discuss Frank Catalano's errata sheet regarding his testimony of when he last sold anodes. (Doc. No. 169 at 32; Doc. No. 177 at 30—31; Doc. No. 193 at 28—30). Because the Court has concluded that the sales made under the original patent are imputed to the reissue patent and that EPS cannot meet its burden as a matter of law in showing that the products sold do not practice the claims of the patent, the Court declines to address the effect Frank Catalano's errata sheet.

The Court finds that EPS is not entitled to pre-suit damages as a matter of law. Therefore, Defendant DTNA's Motion for Summary Judgment as to pre-suit damages is granted, and EPS is not entitled to pre-suit damages before the date of actual notice—the date EPS filed the lawsuit.

## IV.  PLAINTIFF EPS'S MOTION FOR PARTIAL SUMMARY JUDGMENT OF INVALIDITY

EPS argues that DTNA "cannot show that any of its alleged prior art references, standing alone . . . disclose every element of any asserted claim." (Doc. No.

40

168, Pl. Br., at 15). Overall, EPS argues that summary judgment as to each of Defendant's anticipation theories is appropriate. (*Id*.). In addition, EPS contends that the Topaz radiator is not prior art to the patent-in-suit, and thus summary judgement is appropriate as to anticipation and obviousness regarding the Topaz radiator. (*Id*.). In response, DTNA argues that "every issue involves competing facts and a battle of the experts," producing questions of fact for the jury, rather than issues of law to be decided on summary judgment. (Doc. No. 184 (Def. Br.) at 6).

"A patent shall be presumed valid. . . . [and t]he burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." 35 U.S.C. § 282(a). Thus, an invalidity defense must be proved by clear and convincing evidence. *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 95 (2011). The clear and convincing evidence standard applies in the summary judgment context. *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1378 (Fed. Cir. 2005) (citing *Nat'l Presto Indus., Inc. v. W. Bend Co.*, 76 F.3d 1185, 1189 (Fed.Cir.1996)) "Whether a patent is invalid due to public use under § 102(b) is a question of law based on underlying questions of fact." *Id.* (citing *Netscape Communications Corp. v. Konrad,* 295 F.3d 1315, 1321 (Fed. Cir. 2002)).

Prior art is a product or system that was "patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention." 35 U.S.C. § 102. "The proper test for the public use prong of the § 102(b) statutory bar is whether the purported use: (1) was accessible to the public; or (2) was commercially exploited." *Pronova*

*Biopharma Norge AS v. Teva Pharms. USA, Inc.*, 549 F. App'x 934, 938 (Fed. Cir. 2013) (citation omitted).

"Anticipation is a question of fact. Obviousness is a question of law based on underlying factual determinations. Those underlying factual determinations include: (1) the scope and content of the prior art; (2) differences between the prior art and the claims at issue; (3) the level of ordinary skill in the pertinent art; and (4) secondary considerations such as commercial success, long felt but unsolved needs, and failure of others." *Incept LLC v. Palette Life Scis., Inc.*, 77 F.4th 1366, 1371 (Fed. Cir. 2023) (first citing *Mylan Pharms. Inc. v. Merck Sharp & Dohme Corp.*, 50 F.4th 147, 152 (Fed. Cir. 2022); then citing *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 427, 127 S.Ct. 1727, 167 L.Ed.2d 705 (2007); and then citing *Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966)).

Further, "that which infringes, if later, would anticipate, if earlier." *Knapp v. Morss*, 150 U.S. 221, 228, 14 S. Ct. 81, 84, 37 L. Ed. 1059 (1893) (citations omitted).

> A prior art reference anticipates a claim if it discloses all of the claimed limitations and the limitations are arranged in the same way as in the claim. An anticipating prior art reference may anticipate the claimed invention expressly or implicitly, and the full scope of the prior art reference's disclosure is considered. Additionally, prior art references should be considered for all that they teach, rather than being limited to a particular embodiment or the claimed invention of the prior art.

*Hayward Indus., Inc. v. Pentair Water Pool & Spa, Inc.*, 814 F. App'x 592, 595–96 (Fed. Cir. 2020) (citations omitted). "The scope and content of the prior art are factual

questions to be determined by the jury." *Kinetic Concepts, Inc. v. Blue Sky Med. Grp., Inc.*, 554 F.3d 1010, 1019 (Fed. Cir. 2009).

Ultimately, "to be anticipating, a prior art reference must disclose each and every limitation of the claimed invention, must be enabling, and must describe the claimed invention sufficiently to have placed it in possession of a person of ordinary skill in the field of the invention. If there is a genuine issue of material fact relevant to any one of these factors, summary judgment is not proper." *Helifix Ltd. v. Blok-Lok, Ltd.*, 208 F.3d 1339, 1346 (Fed. Cir. 2000) (cleaned up).

For inherent disclosure,

Mere possibility is not enough. Inherency may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient. Rather, a party must show that the natural result flowing from the operation as taught would result in the performance of the questioned function.

*PersonalWeb Techs., LLC v. Apple, Inc.*, 917 F.3d 1376, 1382 (Fed. Cir. 2019) (cleaned up) (quoting *PAR Pharm., Inc. v. TWI Pharm., Inc.*, 773 F.3d 1186, 1195 (Fed. Cir. 2014)).

Further, "it is well established that patent drawings do not define the precise proportions of the elements and may not be relied on to show particular sizes if the specification is completely silent on the issue." *Hockerson-Halberstadt, Inc. v. Avia Grp. Int'l, Inc.*, 222 F.3d 951, 956 (Fed. Cir. 2000) (first citing *In re Wright,* 569 F.2d 1124, 1127, 193 USPQ 332, 335 (CCPA 1977); then citing *In re Olson,* 41 C.C.P.A. 871, 212 F.2d 590, 592, 101 USPQ 401, 402 (CCPA 1954); and then citing *Manual of Patent Examining Procedure* 2125 (1998)). However, when "a person of skill in the

43

art could derive the claimed dimensions from the patent's disclosure, there is no additional requirement that the specification must explicitly disclose the precise proportions or particular sizes." *Cummins-Allison Corp. v. SBM Co.*, 484 F. App'x 499, 507 (Fed. Cir. 2012).

### 1. *Paccar Mod8*

EPS argues that because of the differences between the Paccar Mod8 and the accused products there can be no anticipation. (Doc. No. 168, Pl. Br., at 15). EPS contends that the Mod8 is dissimilar to the accused products because Mahle altered the Mod8 in 2011. (Doc. No. 168 at 15–16).

EPS points to Mr. Sekler's testimony regarding the Mod8 as evidence which forecloses anticipation claims. (Doc. No. 168 at 15). Mr. Hermann Sekler testified that in 2011 "the fluxing of the tube inserts was changed from a paint fluxed version to an unfluxed version." (Doc. No. 168-7, Sekler Depo., at 221–22). Essentially, Plaintiff argues that the flux contained in the Paccar Mod8 prior to 2011 prevents corrosion rather than preferentially corroding, like a sacrificial anode does, thus the pre-2011 Paccar Mod8 cannot be prior art. Defendant DTNA relies on the testimony of Mr. Sekler as well, emphasizing his explanation that the tube reinforcements which included flux was "painted onto the four legs and underside of a tube reinforcement stiffener in order to assist the brazing of the tube reinforcement stiffener to the tubes of the radiator. The top portion of the tube reinforcement stiffener was not painted with the paint flux." (Doc. No. 184-1, Sekler Decl., at 3).

EPS also directs the Court to materials describing NOCOLOK flux, which describes the flux residue as "non-corrosive." (Doc. No. 165-23, Flux Materials, at EPS008260). It also notes that "[i]t is generally accepted that the presence of flux residues on a heat exchanger enhances its corrosion resistance." (Doc. No. 165-22, NOCOLOK Encyclopedia, at EPS008242). According to EPS, because the pre-2011 tubes inserts have a corrosion resistant layer, they do not preferentially corrode, and thus, cannot be a sacrificial anode. (Doc. No. 168 at 16).

EPS further urges the Court to look to the patent for "a flux for brazing metal components" which is used "to improve corrosion resistance." (Doc. No. 165-24, Patent US 8,002,905, at 1:4–2:9, 3:19–3:20, 5:7–5:27, Claim 17). The patent cited by EPS is dated August 23, 2011. EPS also proffers a comparison between the materials standards for the Mod8 pre-2011 and the materials standards for the Mod8 after 2011. (Doc. No. 168 at 16).

EPS's expert, Mr. Nranian, testified that "in the version of the Mod8 that DTNA contends is prior art" the tube inserts in the Mod8 are not the same as those in the accused products because in the prior version, "the tube inserts contain a painted on flux that is corrosion resistant" and the accused products do not contain this flux. (Doc. No. 168-4, Nranian Supp. Rep., at 4).

DTNA's expert Dr. Wendy Sanders stated that she does not agree that "the purpose or function of the tube reinforcement inserts has anything to do with corrosion. The tube reinforcement inserts serve a structural function that would be undermined if they corroded, preferentially or otherwise." (Doc. No. 184-2, Sanders

Decl., at 4). Yet, Dr. Sanders also opined that "the Mod8 rube reinforcement inserts are functionally the same as those in the accused products, and therefore would anticipate if EPS's infringement theory were correct." (*Id.*). She also opines that "it is not clear that NOCOLOK flux residue has anti-corrosive properties relative to the types of corrosion addressed by the patent-in-suit." (*Id.* at 5). Further, she states that "[i]n certain circumstances, flux residue is likely not to have any impact on corrosion." *Id.* at 5. Ultimately, Dr. Sanders claims:

> Further, as expressly noted by NOCOLOK, the nature of most modern coolants dissolves the flux residue layer, thereby negating any claimed anti-corrosion effects. The flux residue would remain on the areas where it was applied, but it would not move to other areas. Here, only the legs and the underside of the tube reinforcement insert are coated with flux, thus, these portions of the tube reinforcement inserts may have flux residue on them after the brazing process attaches the legs of the tube reinforcement insert to its corresponding tubes. The top surface of the tube reinforcement inserts would never have flux residue because this surface is not coated with flux. In other words, if the flux residue had an anti-corrosion effect (I disagree that it does), then the corrosive impact would be localized to where the flux residue remains after brazing—at only the legs and underside of the tube reinforcement inserts and not on the top surface of the tube reinforcement insert.

(*Id.* at 6).

DTNA points to the bill of materials (BOM) for two of the accused products to show that event the accused products contain flux. (Doc. No. 184 at 10). The BOM titled MPC-0000249 for shows material L9757001, which is flux, as does the BOM titled MPC-0000240. To Defendant, this use of flux in other accused products indicates issues of fact regarding where and on what flux is applied. (Doc. No. 184 at 12).

DTNA also emphasizes the disagreements between the experts over whether flux residue has any anticorrosive effect at all. (Doc. No. 184 at 12). For this, Defendant cites the statements of both Dr. Sanders and Mr. Sekler. (*Id.* at 12). Mr. Sekler stated:

> I am not personally aware of any anti-corrosive effect of flux nor did we use flux for that purpose. Regardless, though, for the Mod8, the flux was painted only on the legs and underside of the tube reinforcement stiffener, and thus flux residue would only be present at the joints between the legs and the tubes of the stiffener.

(Doc. No. 184-1 (Sekler Decl.) at 3).

Further, both the flux promotional materials, and the Society of Automotive Engineers (SAE) paper express that the impact of flux is dependent on surrounding conditions. Specifically, the SAE paper 900408, (Doc. No. 185-1), cited by Plaintiff's expert Mr. Nranian, explains that successful corrosion protection is dependent "on specific treatment conditions." The promotional material for flux in the NOCOLOK encyclopedia declares that "it has always been difficult to quantify the level of corrosion resistance enhancement." (Doc. No. 165-22, NOCOLOK Encyclopedia, at EPS008242).

Ultimately, there are genuine issues of material fact which cannot properly be resolved at summary judgment. The documentary evidence and the experts on both sides provide conflicting conclusions on the effect of flux in the Mod8. A battle of the experts should not be resolved at summary judgment. *Reyazuddin v. Montgomery Cnty., Maryland*, 789 F.3d 407, 417 (4th Cir. 2015). It appears to the Court that many of the issues involved in this particular anticipation theory are present in the overall

47

infringement issue as well, as the accused products also appear to contain some amount of flux. There are also issues regarding the location of the flux and how that affects its use, which forecloses summary judgment. Therefore, summary judgment as to anticipation regarding the Paccar Mod8 is denied.

   *2. Topaz Radiator*

      EPS argues that DTNA "has offered no evidence that the radiator sample on which DTNA and Dr. Sanders base their contentions is prior art to the asserted claims" and "nothing connects the SAE papers" to the sample radiator in question. (Doc. No. 168 at 17). DTNA argues that the Topaz radiator is prior art because the evidence shows the radiator is from 1988 and was removed from a 1991 vehicle. (Doc. No. 184 at 16).

      By way of evidence of the date of the Topaz radiator, DTNA observes numbers inscribed on the radiator, "042588," which DTNA claims is the date of the radiator. (Doc. No. 185-2). DTNA's expert, Dr. Sanders, references the numbers as a date in the invalidity chart for the Topaz Radiator. (Doc. No. 165-4, Topaz Chart, at 3). DTNA further provides an image of the packing from the purchased radiator showing that the radiator was removed from a 1991 Topaz, containing a Vehicle Identification Number (VIN) for a Ford Topaz. (Doc. No. 185-3). DTNA also displayed an invoice from Rockford Auto parts showing that the radiator purchased fits a 1986—1991 Mercury Tempo, which is the same as the Ford Topaz. (Doc. No. 185-4).

      Along with the physical radiator and the receipts describing it, DTNA points to two SAE technical papers, both published in 1986, which describe the Tempo and

Topaz radiators. (Doc. No. 185-5, Doc. No. 185-6). The respective titles of the articles are *Vacuum Brazed Aluminum Radiator for Ford Tempo/Topaz* and *New Vacuum Brazed Aluminum Radiators for Ford Light Trucks*.

EPS's assertion that there is no evidence that the radiator sample is from a 1991 model year Ford Topaz, (Doc. No. 168 at 17), is without merit. Evidence has been presented from which a jury could find that the radiator is from a Ford Topaz from 1991. EPS also contends that DTNA cannot connect its sample radiator to the SAE papers to which it refers. (Doc. No. 168 at 17). It seems that the SAE papers do pre-date the radiator sample in question. However, to the extent the papers may describe the Topaz radiator as prior art, the fact that it predates this particular sample radiator is irrelevant—it is still prior art.

Lastly, EPS asserts that no evidence shows that the Topaz Radiator contains a sacrificial anode. (Doc. No. 168 at 18). EPS expresses concern over DTNA's testing of the sample radiator or lack thereof. (Doc. No. 168 at 18). DTNA offers Dr. Sanders' testimony to support that the Topaz radiator contains a "preferentially corroding" zinc anode. (Doc. No. 184 at 19). EPS's expert, Mr. Nranian, disagrees, arguing that Dr. Sanders does not show that there is a piece of metal which preferentially corrodes to protect another piece of evidence. (Doc. No. 168-3, Nranian Rebuttal Rep., at 38).

Dr. Sanders opines that "in the Topaz Radiator, the hot liquid side of the inlet header plate includes a sacrificial anode cladding. At least portions of the inlet header plate are within 10 inches of the inlet." (Doc. No. 165-4, Topaz Chart, at 16). In support of her opinion, she relies upon testing which confirms "the aluminum

construction of the radiator as well as the presence of zinc anodic coating on the interior surfaces of the sample." (*Id.* at 19). Her analysis and opinion are also informed by the SAE technical papers. (*See id.*).

Ultimately, DTNA has presented evidence from which a jury could conclude that the Topaz radiator predated the patent-in-suit and practiced the limitations of the claimed invention, thus the evidence presented by DTNA raises a genuine issue of material fact as to whether the Ford Topaz radiator is prior art. Therefore, summary judgment as to anticipation and obviousness regarding the Topaz radiator is denied.

### 3. *Corrosion Guard*

EPS contends that the Corrosion Guard is not prior art as a matter of law because it is neither installed in a radiator nor installed within 10 inches of the hot liquid inlet. (Doc. No. 168 at 19). DTNA responds that whether Corrosion Guard is part of or installed into the radiator presents a question of fact over what the prior art teaches and how to interpret claim terms not construed by the Court. (Doc. No. 184 at 22–23). With regard to the 10-inch limitation, DTNA asserts that EPS's argument that Corrosion Guard does not disclose being installed within 10 inches of the radiator's hot liquid inlet is merely a difference of opinion. (*Id.* at 24).

Dr. Sanders opines that "[a] person of skill in the art would appreciate that the installation location for the Corrosion Guard is a matter of convenience and ease of access for the installer." (Doc. No. 165-6 (Corrosion Guard Chart) at 11). Further, she notes that "[g]iven that the Corrosion Guard is installed in the upper radiator hose,

50

its proximity to the inlet is a function of the proximity of the engine's hot water outlet to the radiator's hot water inlet. As such, the Corrosion Guard could be installed even closer to the hot water inlet of the radiator than shown in the Corrosion Guard Instruction Video." (*Id.*).

Here, Dr. Sanders' opinion attempts to show anticipatory disclosure based upon the fact that Corrosion Guard could be installed within 10 inches of the hot liquid inlet. The mere possibility of installation within 10 inches is insufficient to anticipate. *PersonalWeb Techs.*, 917 F.3d at 1382. Nothing in the evidence provided indicates that Corrosion Guard discloses the 10-inch limitation in the patent-in-suit. Dr. Sanders' testimony attempts, but fails, to bridge the gap by alleging that Corrosion Guard "could" be installed "even closer to the hot liquid inlet."

DTNA urges the Court to follow several cases which find anticipation where a person of skill in the art would read the prior art to disclose the claim elements. Those cases are a far cry from the case at bar.

DTNA boils *Arthrocare* down to a simple finding of no anticipation because "the accused infringer's expert 'stated that a person of skill in the art would understand' the prior art reference to disclose the claim limitations." However, in that case, the specific claim at issue was the location of the attachment of the electrical leads to the power source, specifically that "the electrical leads attach to the power source from near the proximal end of the endoscope." *Arthrocare Corp. v. Smith & Nephew, Inc.*, 406 F.3d 1365, 1373 (Fed. Cir. 2005). The expert testified that he agreed that the asserted prior art "did not explicitly identify the point at which the wires exit the

51

probe," but "a person of skill in the art would understand that the wires would be attached to the power source after exiting the back end of the probe." *Id.* Here, that is not the case. Dr. Sanders concludes that "[a] person of skill in the art would appreciate that the installation location for the Corrosion Guard is a matter of convenience and ease of access for the installer." Essentially, she appears to assert that the location of the Corrosion Guard does not matter. To disclose that location of installation 'does not matter' is not the same as a disclosure of 10 inches from the hot liquid inlet.

DTNA also cites *In re Gatabi* to illustrate a POSITA's reasonable interpretation of the prior art. (Doc. No. 184 at 25). But in that case, the prior art disclosed the angle of gate conductors to be between 5 and 85 degrees, which the Federal Circuit found encompassed the claim at issue which involved gate angles less than 88 degrees. *In re Gatabi*, No. 2022-1580, 2023 WL 3477285, at *2 (Fed. Cir. May 16, 2023). This would be persuasive if the Corrosion Guard disclosed being placed within 8 inches (or some number less than 10) to the hot liquid inlet, but it does not.

The Court recognizes that "a reference can anticipate a claim even if it does not expressly spell out all the limitations arranged or combined as in the claim, if a person of skill in the art, reading the reference, would at once envisage the claimed arrangement or combination. *Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376, 1381 (Fed. Cir. 2015) (cleaned up). Again, that is not the case here. Dr. Sanders' testimony provides that it "could" encompass the claim limitation, and that is not sufficient as a matter of law. *PersonalWeb Techs.*, 917 F.3d at 1382.

Last, the Court rejects DTNA's claim construction arguments regarding whether Corrosion Guard is a radiator or is it installed in the radiator. It is undisputed that Corrosion Guard is installed inside the top radiator hose. (Doc. No. 165-12). Defendant's argument that this installation inside the radiator hose makes it part of the "radiator assembly" and thus part of the radiator is unavailing and devoid of support from the plain meaning of the word "radiator."

From the evidence presented, no question of fact exists such that a reasonable jury could find that Corrosion Guard discloses each and every limitation of the claimed invention. Therefore, summary judgment of no anticipation is appropriate, and summary judgment of no anticipation as to corrosion guard is granted.

### 4. *Publication References*

EPS contends that summary judgment of no anticipation is appropriate as to DTNA's publication references. (Doc. No. 168 at 21). DTNA argues that Dr. Sanders properly relies on her own interpretations of the prior art publications to opine on anticipation. (Doc. No. 184 at 26). The Court has reviewed the invalidity charts provided and the arguments of the parties. Both parties address the publication references briefly and in summary—the Court will do the same.

Specifically, EPS contends that none of DTNA's publication references disclose a sacrificial anode within 10 inches of the hot liquid inlet to a radiator. (Doc. No. 168 at 21). DTNA contends that Dr. Sanders' and Mr. Nranian disagree as to the invalidity opinions, and accordingly, this is a battle of the experts that should not be resolved at summary judgment. (Doc. No. 184 at 28, 30). There is no dispute that the

10-inch limitation is not expressly disclosed by the publication references. Thus, the question before the Court is whether that gap in disclosure is bridged by other evidence.

For the Hopkins publication, Sanders opines that it "discloses and describes or at least renders obvious a sacrificial anode installed within 10 inches of the hot liquid inlet of the radiator." (Doc. No. 165-3, Hopkins Chart, at 7). In support of her opinion, Sanders quotes from Hopkins: "In preference the flange portion of the sacrificial anode is adapted to be fitted between the thermostat housing flange portion and the engine housing outer surface, to thereby seal the connection therebetween." She also cites figures from Hopkins. (*Id.* at 8). Then, Dr. Sanders opines that a "person of ordinary skill in the art would understand the sacrificial anode 10 in some applications will be at least within 10 inches of the radiator inlet, as shown and annotated above in Fig. 3." (*Id.* at 11). She goes on to opine that a "person of skill in the art would understand that the distance between the thermostat housing gasket and the radiator's hot water inlet is dictated by the size of the engine and orientation of the thermostat housing relative to the inlet." (*Id.*)

For the Martin publication, Dr. Sanders opines that "[g]iven that the corrosion guard in Martin is installed in the radiator inlet hose, its proximity to the radiator inlet is a function of the proximity of the engine's hot water outlet to the radiator's hot water inlet. . . . While the precise installation location is not disclosed by Martin, a person of ordinary skill in the art would understand that the sacrificial anode of Martin could be placed at any location along a relatively straight segment of the

54

radiator inlet hose, including within 10 inches of the hot liquid inlet of the radiator and that placing the sacrificial anode of Martin within this proximity of the hot liquid inlet of the radiator is inherently disclosed by Martin . . . ." (Doc. No. 165-5, Martin Invalidity Chart, at 7–9).[3]

For the Ozaki publication, Dr. Sanders opines that it discloses a sacrificial anode installed within 10 inches of the hot liquid inlet. The publication discloses that "the corrosion preventing layer can also be formed on the internal surfaces of the radiator caps 236 with ease . . ." or "it is ensured that the corrosion preventing layer can be formed on the internal surfaces of the radiator tank . . ." (Doc. No. 165-7, Amended Ozaki Invalidity Chart, at 6). Dr. Sanders provides no other analysis as to why that description would include the "within 10 inches" specification.

For the O'Conner publication, it discloses that "[a]ccordingly, it would be desirable to provide an all-aluminum monolithic heat exchanger which is characterized by significantly reduced internal erosion, particularly at the ends of the coolant tubes immediately downstream of the heat exchanger inlet . . . ." (Doc. No. 165-9 (O'Connor Invalidity Chart) at 19). Dr. Sanders opines that it either expressly or inherently discloses the limitation in conclusory fashion.

For the MacKenna publication, it discloses that "[i]t is a further object of this invention to provide a sacrificial anode of the character described which may be removably fastened to the structure being protected." (Doc. No. 165-10, MacKenna

---

[3] The Martin publication reference is the Corrosion Guard addressed above. Thus, the same analysis would apply here.

55

Invalidity Chart, at 25). Dr. Sanders opines that it expressly or inherently discloses the limitation in conclusory fashion.

For Godefroy, Sanders notes that the publication discloses that "the sacrificial resist may be placed at any other location of the heat exchanger, for example in reservoirs, protrusions, or other recesses which a heat exchanger may define[,]" and concludes that the publication discloses "a sacrificial resist (anode) that can be installed at various locations including within the tubing 12 (hot liquid inlet), which is necessarily less than 10 inches of the hot liquid inlet of the radiator." (Doc. No. 165-2, Godefroy Chart, at 8–9).

All of the aforementioned publication references suffer from the same deficiency: they say nothing regarding the distance of the sacrificial material to the hot liquid inlet. Rather, they indicate a mere possibility of being within 10 inches. That is not sufficient for inherent disclosure. *PersonalWeb Techs*, 917 F.3d at 1382 ("Mere possibility is not enough. Inherency may not be established by probabilities or possibilities.").

The Court concludes that considering the evidence in the light most favorable to DTNA, it has not produced evidence from which a reasonable jury could find that the aforementioned publication references anticipate the patent-in-suit. Ultimately, as the party asserting invalidity, DTNA has the burden of establishing it. 35 U.S.C. § 282. DTNA has not produced evidence that is legally sufficient to meet that burden. Thus, summary judgment is appropriate as to Defendant's publication references.

56

Therefore, Plaintiff's motion for summary judgment of invalidity regarding the publication references listed above is granted.

The remaining publication references, combined with expert opinions, go beyond mere possibility in what they disclose and how that would be understood by a POSITA.

For the Masayuki publication, it discloses that "[i]n the Al alloy-made radiator fitted with the sacrificed anode on the inner surface of its Al alloy-made tube . . ." and "The present invention relates to an Al alloy radiator having improved corrosion resistance by attaching a sacrificial anode to the inner surface of a tube . . . ." (Doc. No. 165-8, Amended Masayuki Invalidity Chart, at 14). Dr. Sanders opines that a person of ordinary skill in the art would have understood the tubes within the radiator of Masayuki JP'2069 would at least partially be within ten inches of the center axis of the hot liquid inlet such that sacrificial anode would be installed within 10 inches of the hot liquid inlet." (*Id.* at 18–19).

For the Yamauchi publication, it discloses "a sacrificial anode material bonded to one surface of the core material, the sacrificial anode material being made of an aluminum alloy consisting of 1.0 to 2.5% of Mg and 0.05 to less than 0.20% of Si with the balance consisting of Al and unavoidable impurities. . . ." (Doc. No. 165-11, Yamauchi Invalidity Chart, at 18). Dr. Sanders opines that "[t]o the extent that Yamauchi '595 does not expressly describe that the sacrificial anodes in the radiator tubes/header plates are 'installed within 10 inches of the hot liquid inlet'" . . . a person of ordinary skill in the art would have understood the tubes and header plates for the

radiators generally described by Yamauchi '595 would at least partially be within 10 inches of the center axis of the hot liquid inlet such that the sacrificial anode(s) installed within each would be 'installed within 10 inches of the hot liquid inlet.'" (*Id.* at 32).

Dr. Sanders opinions on these publications demonstrate that a POSITA would understand a potential inherent disclosure. Accordingly, a genuine issue of material fact exists, and summary judgment is inappropriate on these publication references.

## V.     CONCLUSION

**IT IS, THEREFORE, ORDERED** that Defendant DTNA's Omnibus Motion for Summary Judgment, (Doc. No. 162) is **GRANTED in part and DENIED in part**, and Plaintiff's Motion for Summary Judgment of Invalidity, (Doc. No. 165), is **GRANTED in part and DENIED in part**, as stated herein.

The parties shall confer and file a joint proposal within **thirty (30) days** of the entry of this order indicating a proposed trial date for this matter.

**IT IS SO ORDERED.**
Signed: September 11, 2024

Robert J. Conrad, Jr.
United States District Judge